**MERITAGE HOMES CORPORATION and Meritage Homes of Nevada, Inc., Plaintiffs and Counter–Defendants,**

v.

**JPMORGAN CHASE BANK, N.A., Defendant and Counter– Claimant.**

**Adversary No. 11–2388.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division at Columbus.

June 26, 2012.

Tiffany Strelow Cobb, Columbus, OH, Reginald W. Jackson, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, for Plaintiff.

Alexander M. Andrews, Ulmer & Berne LLP, Columbus, OH, Todd A. Atkinson, Ulmer & Berne LLP, Cleveland, OH, James E. Hough, New York, NY, for Defendant.

## MEMORANDUM OPINION AND ORDER ON MOTION TO TRANSFER AND MOTION FOR REMAND

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

In this adversary proceeding, the Court is serving as a stopover on the road to litigation elsewhere because the parties agree that the merits of their dispute should be adjudicated by a court other than this one. They disagree, however, on which tribunal should decide those merits.

1. Meritage Homes of Nevada, Inc. ("Meritage Nevada") is an Arizona corporation with its principal place of business in Las Vegas, Nevada. It is a subsidiary of Meritage Homes Corporation ("Meritage Corp."), a Maryland corporation with its principal place of business in Scottsdale, Arizona. Because the distinction between the companies generally does not matter for purposes of this opinion, the Court will refer to "Meritage" whenever it means one or both of them, unless there is a reason to distinguish between the two.

2. Under 28 U.S.C. § 1452(a) (entitled "Removal of claims related to bankruptcy cases"), with certain limited exceptions not applicable here, "[a] party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a). JPMorgan concedes that this statute provides the only basis for removing the State Court Action. The State Court Action does not present a federal question, so removal is not available under 28 U.S.C. § 1441(a) (providing that, "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."). Further, as explained below, JPMorgan is a citizen of Ohio, and removal therefore is not available under 28 U.S.C. § 1441(b)(2), which provides that "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction ... may not be

■ Meritage Homes Corporation and Meritage Homes of Nevada, Inc.[1] filed a complaint ("State Court Complaint") commencing a lawsuit ("State Court Action") against JPMorgan Chase Bank, N.A. ("JPMorgan") in the Common Pleas Court of Franklin County, Ohio ("Ohio State Court"). On September 2, 2011 ("Removal Date"), JPMorgan filed its notice of removal ("Notice of Removal") (Doc. 1) pursuant to 28 U.S.C. § 1452(a)[2] and Rule 9027(a) of the Federal Rules of Bankrupt-

removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

JPMorgan is a citizen of Ohio because it is a federally chartered bank whose main office is located in Ohio. *See Murphy v. JP Morgan Chase*, 2011 WL 6122642, at *3 n. 2 (S.D.Ohio Dec. 8, 2011) ("The Supreme Court has held that federally chartered national banks, which are not incorporated in any state 'shall ... be deemed citizens of the state in which they are respectively located' for diversity jurisdiction purposes. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 and 318, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006). Moreover, a national bank is 'located' in the state where its 'main office' is located as [designated] in its organization certification and articles of association. Defendant JPMorgan Chase Bank is a citizen of Ohio. JP Morgan's Articles of Association state that [its] 'main office ... shall be in the ... State of Ohio.')." *See also* 28 U.S.C. § 1348 ("The district courts shall have original jurisdiction of any civil action commenced by the United States, or by direction of any officer thereof, against any national banking association, any civil action to wind up the affairs of any such association, and any action by a banking association established in the district for which the court is held, under chapter 2 of Title 12, to enjoin the Comptroller of the Currency, or any receiver acting under his direction, as provided by such chapter. *All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.*" (emphasis added)).

cy Procedure ("Bankruptcy Rule"),[3] contending that removal was appropriate because the State Court Action was "related to" the bankruptcy case of a third entity, South Edge, LLC ("South Edge"), within the meaning of 28 U.S.C. § 1334(b).[4] South Edge's bankruptcy case, captioned *In re South Edge, LLC,* Case No. 10–32968 ("South Edge Bankruptcy Case"), is pending in the United States Bankruptcy Court for the District of Nevada ("Nevada Bankruptcy Court").

JPMorgan then filed a motion ("Transfer Motion") (Doc. 2) requesting that the State Court Action be transferred to the United States District Court for the District of Nevada ("Nevada Federal District Court") on several grounds: (1) the South Edge Bankruptcy Case is pending in the Nevada Bankruptcy Court; (2) Meritage's appeal of the order ("Confirmation Order")[5] confirming South Edge's Chapter 11 plan ("Plan")[6] is pending in the Nevada Federal District Court; and (3) the Nevada Federal District Court is already familiar with the facts and issues presented in the State Court Action because it has presided over other lawsuits arising out of the same real estate development in Nevada (described below) that gave rise to the State Court Action.

In response, Meritage filed a motion for remand ("Remand Motion") (Doc. 12), arguing that no basis for removal exists because the State Court Action could not conceivably have had any effect on the bankruptcy estate of South Edge ("Estate") on the Removal Date and, therefore, the State Court Action was not related to the South Edge Bankruptcy Case on that date. Meritage further argues that, even if the State Court Action was related to the South Edge Bankruptcy Case on the Removal Date, it must be remanded for lack of jurisdiction because it was not removed to the United States District Court for the Southern District of Ohio ("Ohio Federal District Court"). Finally, Meritage contends that, as a result of the confirmation of the Plan and other events that occurred subsequent to the Removal Date, the State Court Action is no longer related to the South Edge Bankruptcy Case. As a result, Meritage argues, no federal court has jurisdiction over the State Court Action, meaning that equitable remand of the State Court Action pursuant to 28 U.S.C. § 1452(b) and permissive abstention under 28 U.S.C. § 1334(c)(1) are both warranted.

For the reasons set forth below, the Court concludes that: (1) removal was appropriate because the State Court Action was related to the South Edge Bankruptcy Case on the Removal Date; (2) a transfer to the Nevada Federal District Court is warranted based on, among other reasons, the continued relatedness of the State Court Action to the South Edge Bankruptcy Case as of the present time; and (3) although neither equitable remand nor permissive abstention appears to be appropriate, the ultimate decision on the propri-

---

3. Bankruptcy Rule 9027(a) provides in pertinent part that "[a] notice of removal shall be filed with the clerk for the district and division within which is located the state or federal court where the civil action is pending." Fed. R. Bankr.P. 9027(a).

4. Section 1334(b) of the Judicial Code sets forth three categories of civil proceedings over which the district courts have original jurisdiction: (1) those "arising under title 11," (2) those "arising in" bankruptcy cases and (3) those "related to" such cases. 28 U.S.C. § 1334(b).

5. A copy of the Confirmation Order is attached as Exhibit 1 to the Declaration of James E. Hough (Doc. 52) ("Initial Hough Declaration").

6. A copy of the Plan is attached to the Confirmation Order.

534

ety of remand and abstention should be made in the District of Nevada. The Court accordingly concludes that the Transfer Motion should be granted and the Remand Motion denied without prejudice to its renewal in the District of Nevada. But because the parties have not consented to the Court's entry of final orders, and because, as explained below, there is a question whether an order transferring an adversary proceeding to another federal court is a final order, the Court is submitting this opinion as a report and recommendation to the Ohio Federal District Court.

## II. Jurisdiction

■ Meritage argues that the Court lacks jurisdiction to do anything other than remand the State Court Action because JPMorgan removed it here rather than to the Ohio Federal District Court. The parties have spent much time addressing the split of authority and debating the various arguments concerning the issue of whether state court actions should be removed to district courts rather than directly to bankruptcy courts. There are good arguments on both sides of the debate. *Compare Indus. Clearinghouse, Inc. v. Mims (In re Coastal Plains, Inc.)*, 338 B.R. 703, 710 (N.D.Tex.2006) (holding that the notice of removal was properly filed with the bankruptcy court) *with Searcy v. Knostman*, 155 B.R. 699, 704 (S.D.Miss.1993) (holding that the notice of removal should have been filed with the district court). But the Court need not choose a side in this debate. Because even if the State Court Action should have been removed to the Ohio Federal District Court, the Court clearly has the jurisdiction to at least hear the Transfer Motion and Remand Motion.

Although the United States Court of Appeals for the Sixth Circuit has not addressed the issue, decisions of several other federal courts of appeals support the proposition that the removal of a state court action directly to a bankruptcy court does not require remand and does not result in the bankruptcy court lacking jurisdiction to at least hear the matter. *See Townsquare Media, Inc. v. Brill*, 652 F.3d 767, 770 (7th Cir.2011) (holding that a state court action "was properly removed" even though it was removed to the bankruptcy court, and stating: "Although section 1452(a) provides for removal to the district court rather than to the bankruptcy court, Bankruptcy Rule 9027, buttressed by standing orders in the district courts (including the district court for the Southern District of Indiana), transfers removed suits from district court to bankruptcy court."); *Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.)*, 505 F.3d 237, 246–47 & n. 8 (3d Cir.2007) ("[W]e do not categorize this filing issue [arising from removal of an action directly to the bankruptcy court] as relating to the bankruptcy court's subject matter jurisdiction.... In any event.... Federal Rule of Bankruptcy Procedure 9027(a)(1) permits the filing of a notice of removal with the 'clerk,' a term that Rule 9001(3) defines as 'bankruptcy clerk,' and 28 U.S.C. § 1452(a) permits removal to the 'district court,' an entity of which the bankruptcy court is a unit. 28 U.S.C. § 151.... We also point out that the Western District of Pennsylvania has a general order referring all bankruptcy cases and proceedings filed in the district to the bankruptcy judges...."); *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773 n. 4 (8th Cir.1995) ("The fact that the state court action was removed directly to the bankruptcy court rather than the district court did not deprive the bankruptcy court of jurisdiction."); *Creasy v. Coleman Furniture Corp.*, 763 F.2d 656, 661 n. 5 (4th Cir.1985) ("We believe ... that the [Bankruptcy Amendments and Federal Judgeship Act of 1984], which vests the bank-

ruptcy jurisdiction in the district courts on the effective date of the Act, enables the district court to exercise jurisdiction over a removed action even though technically the case was removed to a bankruptcy court, not a district court, as long as the removal is otherwise proper."). *See also Calvary Baptist Temple v. Church Mortg. Acceptance Co., LLC,* 2011 WL 2457405, at *1 (S.D.Ga. June 16, 2011) ("Courts disagree over whether [28 U.S.C. § 1452(a) ] requires removal only to the district court for referral to the bankruptcy court or, instead, allows removal directly to the bankruptcy court. . . . The Court need not decide this issue, and no party has argued that this Court is without jurisdiction to rule on Plaintiff's Motion to Remand. Consistent with the Bankruptcy Judge's report and recommendation, the Court finds that a remand on merely procedural grounds would be a 'waste of judicial resources' and likely result in a second notice of removal to the district court, automatic referral to the bankruptcy court, and a substantially similar and duplicative order by this or the bankruptcy court.").

In light of the foregoing, the Court concludes that a remand based on the removal of the State Court Action to this Court rather than to the District Court would be unwarranted. And, given the relatedness of the State Court Action to the South Edge Bankruptcy (an issue discussed in detail below), the Court concludes that it has the jurisdiction to hear the Transfer Motion and the Remand Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in the Ohio Federal District Court ("General Order").[7]

▆▆▆ The more difficult question is whether the Court has the authority to enter a final order remanding or transferring the State Court Action absent the consent of the parties, or whether the Court instead must, as the bankruptcy court did in the *Calvary Baptist Temple* case, submit a report and recommendation to the Ohio Federal District Court. The question matters here because JPMorgan stated in the Notice of Removal that "the claims asserted against it [in the State Court Action] are non-core within the meaning of 28 U.S.C. § 157(b)" and that it "does not consent to the entry of final orders or judgment by the bankruptcy court." Notice of Removal at 8–9.[8] Like-

---

7. Section § 157(a) of the Judicial Code states that "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). The General Order refers "all actions, matters or proceedings arising under [the Bankruptcy Code] or arising in or related to a case under the Bankruptcy Act and [the Bankruptcy Code]" to the "Bankruptcy Judges for this Judicial District. . . ." General Order No. 05–02. The General Order is available at http://www.ohsd.uscourts.gov/generalorders/District/05-02%20Gen%20Ord%20Re%20Bankruptcy%20Cases.pdf. Meritage argues that the General Order does not apply here because the South Edge Bankruptcy Case is pending in a district other than the Southern District of Ohio. This argument is inconsistent with the

express text of the General Order, which in no way limits the reference to matters related to bankruptcy cases pending in the Southern District of Ohio.

8. JPMorgan's assertion that the State Court Action was non-core meant, by necessary implication, that JPMorgan was taking the position that the State Court Action did not arise under the Bankruptcy Code or arise in the South Edge Bankruptcy Case. *See Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 2605, 180 L.Ed.2d 475 (2011) ("[C]ore proceedings are those that arise in a bankruptcy case or under Title 11."). Consistent with that position, JPMorgan represented that the State Court Action was related to the South Edge Bankruptcy Case, but did not allege that the State Court Action arose in that case or arose under the Bankruptcy Code. *See* Notice of

wise, Meritage represented in its statement filed in response to the Notice of Removal that it "does not consent to the entry of final orders or judgment by the bankruptcy court." *See* Doc. 8 at 2.

■ Under 28 U.S.C. § 157(c), "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11," the caveat being that "[i]n such [a] proceeding, the bankruptcy judge['s] [role is limited to] submit[ting] proposed findings of fact and conclusions of law to the district court...."[9] 28 U.S.C. § 157(c). There is no doubt, therefore, that the Court, absent the consent of the parties, lacks the authority to enter a final order in a proceeding that is merely related to a bankruptcy case.

■ But what is the "proceeding" in the context of a motion to transfer and a motion to remand? There are two ways to look at the question. Under one view, the "proceeding" is the motion to remand or the motion to transfer itself. When viewed that way, several courts-including this one—have held that bankruptcy courts have the authority to decide such motions on a final basis. *See Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832,

Removal at 2, 6. In a brief filed after the hearing on the Transfer Motion and the Remand Motion, however, JPMorgan argued for the first time that the State Court Action arises under the Bankruptcy Code. This change in position came too late. Under the law of the Sixth Circuit, defendants are permitted, even after the time for removal has expired, to include additional factual allegations supporting the type of jurisdiction that was asserted in the original notice. *See Tech Hills II Assocs. v. Phoenix Home Life Mut. Ins. Co.*, 5 F.3d 963, 969 (6th Cir.1993) (holding that defendant could, even after the time for removal had expired, assert additional factual allegations supporting the diversity jurisdiction that was asserted in the original notice). As Meritage points out, however, by arguing that the State Court Action arises under the Bankruptcy Code, JPMorgan attempts to assert an entirely new theory in support of removal, which is prohibited after the time for filing the notice of removal has passed. *See, e.g., Hahn v. Rauch*, 602 F.Supp.2d 895, 909 (N.D.Ohio 2008) ("Defendants did not assert ... complete preemption in the notice of removal. These bases were raised for the first time in Defendants' opposition to the motion to remand. A defendant cannot argue a new substantive ground as a basis for removal in opposing remand."); *Davis v. Life Investors Ins. Co. of Am., Inc.*, 214 F.Supp.2d 691, 694 (S.D.Miss.2002) (citing numerous decisions in which "courts have refused to allow amendment of the removal notice beyond the thirty-day period for removal where the ground for removal existed but was not asserted within the thirty-day removal period, for in those cases, the failure to assert an existing basis for removal jurisdiction was viewed as a substantive defect."); *Strauss v. Am. Home Prods. Corp.*, 208 F.Supp.2d 711, 717 (S.D.Tex.2002) ("A defendant may *not* amend *its* removal notice *to* remedy a *substantive* defect (i.e., to add a new basis for federal jurisdiction) after the thirty-day time limit expires."). Accordingly, JPMorgan's belated "arising under" argument cannot serve as a basis for removal, and the Court therefore need not consider the argument.

9. Section 157(c) of the Judicial Code provides:

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title. 28 U.S.C. § 157(c).

844 (Bankr.S.D.Ohio 2011) ("Motions seeking dismissal based on an alleged lack of subject-matter jurisdiction are core proceedings.... So too are motions seeking abstention, remand and transfer of venue.... Accordingly, the Court has the authority to enter an order on the Motions without submitting proposed findings of fact and conclusions of law to the District Court."); *Official Unsecured Creditors' Comm. v. Cohen (In re Hearthside Baking Co.)*, 391 B.R. 807, 811 (Bankr.N.D.Ill.2008) ("A motion to abstain and remand a non-core 'related to' proceeding previously removed to a bankruptcy court is a matter that, by its very nature, could exist only in connection with a bankruptcy case, and is a matter over which a bankruptcy court exercises core jurisdiction, with the authority to enter final orders therein."); *Frelin v. Oakwood Homes Corp.*, 292 B.R. 369, 376 (Bankr.E.D.Ark.2003) (holding that motions for abstention, remand and transfer of venue are core proceedings and that the court has the authority to enter final orders on such motions). This approach makes sense. After all, statutorily core matters include matters "arising in" bankruptcy cases, 28 U.S.C. § 157(b)(1), matters that arise in bankruptcy cases are those that "exist ... only because of the bankruptcy case[,]" *Bavelis*, 453 B.R. at 853, and a motion to remand or transfer a lawsuit that is removable only because it is related to a bankruptcy case would seem to fit that description.

Under the alternative view, however, the "proceeding" referenced in 28 U.S.C. § 157(c) is not the motion to remand or transfer itself, but rather is the underlying lawsuit—here, the State Court Action. Applying that approach, it could be argued, as a party has done in another case in which the court did not decide the issue, that a motion to remand or transfer a proceeding that is merely related to a bankruptcy case is itself a related-to matter. *See BancBoston Real Estate Capital Corp. v. JBI Assocs. Ltd. P'ship (In re Jackson Brook Inst., Inc.)*, 227 B.R. 569, 585 (D.Me.1998) ("Associates also raises several procedural issues on appeal. It argues that a remand motion concerning a noncore proceeding is itself a noncore matter and, thus, the bankruptcy court was limited to submitting proposed findings of fact and conclusions of law to this Court pursuant to section 157(c)(1), rather than issuing a final order."). If that approach is correct, then the Court would, by entering an order granting the Transfer Motion or the Remand Motion, be issuing a final order in a proceeding that is merely related to a bankruptcy case.

While it concludes that the first approach discussed above is the better one, the Court will follow the second approach in this adversary proceeding in light of the positions taken by the parties. JPMorgan has not directly addressed whether it considers the Remand Motion itself to be a core proceeding in which the Court could enter a final order, but has withheld its consent to this Court's entry of final orders; thus, if the Court were to remand the State Court Action to the Ohio State Court, JPMorgan might argue that the Court lacked the authority to do so because it had not consented. Meritage has declined to consent to the Court's entry of final orders in this adversary proceeding and has argued that only the Ohio Federal District Court has the authority to decide the Transfer Motion. So if the Court were to transfer the State Court Action to the Nevada Federal District Court, Meritage clearly would argue that this Court did not have the authority to take that action. Thus, because neither party has consented to this Court's entry of final orders, in this adversary proceeding the Court will follow

the second approach discussed above, under which (1) the "proceeding" for purposes of 28 U.S.C. § 157(c) is the State Court Action and (2) the Transfer Motion and the Remand Motion therefore are non-core matters in which the Court does not have the authority to issue a final order.

■ The question then becomes whether an order granting a motion to remand or a motion to transfer—and here the Court will do one or the other—is a final order. In the bankruptcy context, a final order is one that "finally dispose[s] of discrete disputes within the larger case...." *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Conn. (In re Dow Corning Corp.)*, 86 F.3d 482, 488 (6th Cir.1996). In *Dow Corning*, the Sixth Circuit held that a district court erred when it concluded that certain claims for relief could have no conceivable effect on the debtor's bankruptcy estate and therefore could not be transferred to another federal district court; in so holding, the Sixth Circuit also held that the district court's order denying a request to transfer those claims to another federal district court was a final order. *See Dow Corning*, 86 F.3d at 488. If an order denying a request to transfer a proceeding can be a final order, then an order transferring a case arguably is all the more so. The Sixth Circuit, however, has not addressed the precise issue, and the Court therefore will analyze it more fully below.

■ The analysis begins with motions to remand. Under the law of the Sixth Circuit, an order remanding a proceeding to a state court—even outside of bankruptcy—is a dispositive order. *See Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 517 (6th Cir.2001) ("[R]emand [orders] are dispositive and ... can only be entered by district courts.... [W]e apply a functional equivalency test to see if a particular motion has the same practical effect as a

recognized dispositive motion. Applying that test ... we ... find that a remand order is the functional equivalent of an order to dismiss. The practical effect of remand orders and orders to dismiss can be the same; in both, cases are permitted to proceed in state rather than federal court. Because he was not authorized to enter a dispositive remand order, the magistrate judge's ... remand order ... was not a valid order."). There is no reason the rule should be any different in the bankruptcy context. An order remanding the State Court Action to the Ohio State Court, therefore, clearly would be a final order.

■ The concept of symmetry would seem to suggest that this should hold true for an order transferring the State Court Action; if remanding a lawsuit back to the state court from which it came has a dispositive effect as to the party who does not want it decided in that court, then transferring the lawsuit away from the state court should have a dispositive effect as to the party who wants the matter heard there. But part of the Sixth Circuit's rationale in *Vogel* for holding that a remand order is the functional equivalent of an order to dismiss was that "in both, cases are permitted to proceed in state rather than federal court." *Vogel*, 258 F.3d at 517. That rationale arguably is inapplicable in the context of an order transferring an action from one federal court to another.

Some courts have so held, while others have found this to be a distinction without a difference and have extended the reasoning of courts such as the Sixth Circuit in *Vogel* to the transfer context. In fact, there is a split of authority on the issue of whether an order transferring a lawsuit to another federal court is a final order. Several courts have held that such orders are not dispositive. *See Williams Advanced*

*Materials, Inc. v. Target Tech. Co.,* 2007 WL 2245886, at *3 (W.D.N.Y. Aug. 1, 2007) ("An order to change venue is a non-dispositive order that is reviewed under a 'clearly erroneous or contrary to law' standard."); *City of Columbus v. Hotels.com, L.P.,* 2007 WL 2029036, at *3 (S.D.Ohio July 10, 2007) ("Because a motion to transfer venue is not a dispositive motion, Magistrate Judge Abel's recommended disposition of the motion is not subject to *de novo* review."); *Goel v. Patni Computer Sys., Inc.,* 2007 WL 1725287, at *2 (C.D.Ill. June 13, 2007) ("Like discovery motions, a motion to transfer venue is a non-dispositive pre-trial matter which is reviewed under the 'clearly erroneous' standard."); *Silong v. United States,* 2006 WL 948048, at *1 n. 1 (M.D.Fla. Apr. 12, 2006) ("A motion to transfer venue involves a non-dispositive pretrial matter, which a magistrate judge may determine. . . .").

By contrast, other courts have held that an order transferring a matter from one federal court to another is dispositive. *See Payton v. Saginaw Cnty. Jail,* 743 F.Supp.2d 691, 693 (E.D.Mich.2010) ("The Court believes that the most accurate measure of whether an order on a motion is 'dispositive' is not whether the merits of the dispute are adjudicated, but whether activity in the case *in that forum* is terminated. . . . An order transferring venue has a similar effect on the litigation [as an order remanding the lawsuit]. Although the parties may proceed in a different forum, the plaintiff is deprived of his chosen forum and is forced to litigate elsewhere. The order is the functional equivalent of a dismissal of the case—albeit without prejudice—in that forum. . . . Decisions with consequences of that character ought to be made in final form by Article III judges, even when the able assistance of a magistrate judge is sought."); *Bennett v. CSX Transp., Inc.,* 2010 WL 4646248, at *1 n. 1 (D.S.C. Nov.

8, 2010) ("The instant motion to transfer venue was individually referred to the Magistrate Judge for disposition. While a motion to transfer venue does not explicitly fall within any of the dispositive motions set forth in 28 U.S.C. § 636(b)(1)(A) and there is a split of opinion in this district as to whether a Magistrate Judge has the authority to order a transfer of venue, Magistrate Judge Hodges has prepared a [report and recommendation], which is subject to *de novo* review pursuant to 28 U.S.C. § 636(b)(1), rather than a final order on the motion.").

If an order transferring the State Court Action to the Nevada Federal District Court is dispositive, and if the Court were to issue such an order, then the Court would (under the approach it is following for purposes of this adversary proceeding) be issuing a final order in a matter that is merely related to a bankruptcy case, which the Court is prohibited from doing under 28 U.S.C. § 157(c). In circumstances where their authority to enter orders transferring cases was open to debate, other courts have issued reports and recommendations to district courts rather than purporting to enter final orders. *See F.T.C. v. Consumer Health Benefits Ass'n,* 2011 WL 2341097, at *1 n. 4 (E.D.N.Y. June 8, 2011) (stating, in a case where "[t]his Circuit's case law leaves some question as to whether a United States Magistrate Judge has the authority to" enter an order on a final basis that "[o]ut of an abundance of caution, this Court has fashioned its conclusions . . . as a Report and Recommendation"); *Beavers v. Express Jet Holdings, Inc.,* 421 F.Supp.2d 994, 995–96 (E.D.Tex.2005) ("There is a split of authority as to whether a motion to transfer venue is one that—absent consent of the parties—magistrate judges may (a) hear and determine, or (b) only recommend an appropriate disposition via a writ-

ten report. In absence of governing circuit precedent, the undersigned elects to submit a report." (footnote omitted)). *See also Pilgrim's Pride Corp. v. MDL Fair Labor Standards Act Litig. (In re Pilgrim's Pride Corp.)*, 415 B.R. 635, 636–37 (N.D.Tex.2009) ("Section 1412 provides '[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.' Thus, in an abundance of caution, the bankruptcy court issued the report and recommendation recommending that … the motion to transfer be granted."). The Court will follow suit and, in an abundance of caution, will issue this opinion as a report and recommendation to the Ohio Federal District Court.

### III. Background

#### A. Procedural History

After the parties filed responses to, and replies in support of, the Transfer Motion and the Remand Motion,[10] oral argument was held in January 2012 at the request of the parties' counsel. On January 5, 2012, the Court held a hearing on the motions ("Hearing"). The transcript of the Hearing ("Tr.") is docketed at Doc. No. 47.

Meritage's counsel advised the Court during the Hearing that Meritage intended to file with the Nevada Federal District Court an amended notice of issues on appeal of the Confirmation Order. *See* Tr. at 34:18–23. In response, JPMorgan's counsel requested that his client be provided an opportunity to file a post-hearing brief addressing the impact of the revised notice of

appeal. *See* Tr. at 100:8–102:3. At the conclusion of the Hearing, the Court directed Meritage to submit to the Court any revised notice of appeal that it would be filing with the Nevada Federal District Court. The Court also provided the parties an opportunity to file post-hearing briefs analyzing the manner in which the revised notice of appeal would affect the issue of whether the State Court Action is related to the South Edge Bankruptcy Case.

During the Hearing, Meritage, in an effort to support its position that the State Court Action was not related to the South Edge Bankruptcy Case, utilized a chart that purported to depict the structure and implementation of the Plan as of its effective date, *see* Tr. at 28–34, which was November 18, 2011 ("Effective Date").[11] The Court informed counsel for the parties that it could rely on the chart only if there was a stipulation as to its accuracy, or the accuracy of any revised version of the chart. *See* Tr. at 102:10–11. Because he had not seen the chart until the day of the Hearing, JPMorgan's litigation counsel requested that he be afforded an opportunity to review the chart with JPMorgan's bankruptcy counsel before stipulating to its accuracy. The Court and Meritage's counsel agreed that the request was reasonable. *See id.* at 102:21–103:8.

Shortly after the Hearing, Meritage filed a notice (Doc. 44) of its amended statement of issues on appeal of the Confirmation Order ("Amended Statement"), which will be discussed in more detail in

10. Meritage filed a response to the Transfer Motion ("Meritage Resp.") (Doc. 22); JPMorgan filed a reply ("JPMorgan Reply") (Doc. 26) in support of the Transfer Motion. JPMorgan filed an opposition ("JPMorgan Opp'n") (Doc. 28) to the Remand Motion; Meritage filed a reply ("Meritage Reply") (Doc. 34) in support of the Remand Motion.

11. *See* Notice of Occurrence of Effective Date of Plan of Reorganization; Notice of Administrative Claim Bar Date and Rejection Damage Claim Bar Date, Doc. 1385 in the South Edge Bankruptcy Case.

Section III.K below.[12] The Court then entered an agreed order (Doc. 45) providing that the parties "shall file a stipulated chart depicting the post-confirmation, effective date structure of the [Plan]" and that "[i]n the event the parties cannot stipulate to all aspects of such structure, the parties may submit an annotated and/or footnoted chart depicting areas of agreement and areas of disagreement regarding said structure, with brief supplemental explanation of the reasons for such disagreement." Doc. 45 at 2.

Meritage and JPMorgan filed a stipulated chart ("Stipulated Chart") (Doc. 50) depicting the implementation of the Plan as of the Effective Date. The Stipulated Chart, a copy of which is attached as an exhibit to this opinion, sets forth certain information that was not contained in the chart discussed during the Hearing ("Additional Information"), including Additional Information contained in the boxes entitled "Meritage Potential Offset" and "Meritage Asserted Indemnity Claim if Meritage pays under Guaranty (POC # 41)." The information set forth in the Stipulated Chart is discussed in more detail below in Section III.J and in Section IV.A in connection with the Court's analysis of the issue of whether the State Court Action is related to the South Edge Bankruptcy Case.

The parties also filed post-hearing briefs (JPMorgan's is docketed at Doc. 51 and Meritage's at Doc. 53) addressing the issue of whether the State Court Action is related to the South Edge Bankruptcy Case. JPMorgan relied in part on the Additional Information in support of its argument that the State Court Action could conceivably have an effect on the Estate and therefore is related to the South Edge Bankruptcy Case. The Court concluded that JPMorgan's arguments regarding the effect of the Additional Information on the issue of whether the State Court Action is related to the South Edge Bankruptcy Case required clarification. And Meritage failed to address this issue or any other issue raised by the Additional Information in its brief. Thus, after reviewing the Stipulated Chart and the initial post-hearing briefs, the Court determined that responses by the parties to those briefs would materially assist it in disposing of the Transfer Motion and the Remand Motion, and the Court therefore entered an order (Doc. 55) directing the parties to file responses addressing any legal and factual issues raised by the other party's post-hearing brief, including, without limitation, certain issues raised by the Court. On March 16, 2012, JPMorgan filed a supplemental post-hearing brief ("JPMorgan Supplemental Post–Hearing Brief") (Doc. 57), as did Meritage ("Meritage Supplemental Post–Hearing Brief.") (Doc. 59).

In the JPMorgan Supplemental Post–Hearing Brief, JPMorgan stated that an action might be brought against Meritage on behalf of the Estate. Consistent with that statement, on March 19, 2012, JPMorgan filed a notice (Doc. 60) of a motion to compel arbitration that had recently been filed in the Nevada Bankruptcy Court by the representative of the Estate regarding its arbitration demand for approximately $23 million from Meritage. This arbitration proceeding is discussed in Section III.L below.

### B. The Nevada Real Estate Project

Turning to the events that gave rise to this adversary proceeding, the Court begins at the beginning, in 2004, when Meritage and seven other entities involved in

---

**12.** A copy of the Amended Statement is attached as Exhibit 1 to Doc. 44.

the housing industry formed South Edge.[13] The purpose of South Edge's formation was to purchase and develop the Inspirada real estate development ("Inspirada"), a master-planned community to be constructed in Henderson, Nevada.[14] In addition to an operating agreement ("Operating Agreement"), the Members entered into agreements under which they had the right and obligation to purchase from South Edge certain amounts of acreage within Inspirada, which established their ownership share in South Edge. In the case of Meritage, that ownership interest would cover approximately 3.5% of the land that South Edge would eventually acquire. The purchase and sale agreement to which Meritage is a party, as amended, will be referred to as the "Acquisition Agreement."

In November 2004, South Edge acquired from the Bureau of Land Management approximately 1,940 acres of real property at a cost of approximately $557 million.[15] It financed the purchase in part by entering into a credit agreement ("Credit Agreement") with a syndicate of lenders ("Lenders"), including JPMorgan (the administrative agent for the Lenders), for a loan of up to $535 million, which was subsequently increased to $585 million ("Loan").[16] The financing was secured by, among other things, a Deed of Trust and Security Agreement ("Deed of Trust") and an assignment of the Acquisition Agreement ("Assignment Agreement").[17] Meritage contends that, under the Credit Agreement, South Edge was to pay the Lenders a portion of the purchase price ("Release Price") each time Meritage made a purchase (sometimes referred to as a "takedown") pursuant to the Acquisition Agreement. Meritage also alleges that: (1) upon the payment of the Release Price, JPMorgan was required by the Assignment Agreement to release the lien on the applicable parcel of property created by the Deed of Trust and to do so even if South Edge was in default under the Credit Agreement; and (2) the debt incurred by South Edge under the Credit Agreement was non-recourse to Meritage and the other Members, so that the Lenders'

---

**13.** In addition to Meritage, the members of South Edge ("Members")—with their respective parent entities that guaranteed the debt discussed below ("Parent Guarantors") identified in parentheses—are as follows: Focus South Group, LLC ("Focus") (John A. Ritter); Alameda Investments, LLC ("Alameda") (Woodside Group, LLC); Coleman–Toll Limited Partnership (Toll Brothers, Inc.); Beazer Homes Holdings Corp. (Beazer Homes USA, Inc.); KB Home Nevada, Inc. (KB Home); Kimball Hill Homes of Nevada, Inc. ("Kimball Hill") (Kimball Hill, Inc.); and Pardee Homes of Nevada, Inc. (Weyerhaeuser Real Estate Company). Focus is a developer, while the other Members are in the homebuilding industry.

**14.** The entity that joined in the formation of South Edge was Meritage Nevada. As discussed below, Meritage Corp. provided a guaranty of the debt incurred by Meritage Nevada to JPMorgan and certain other lenders.

**15.** According to the disclosure statement for the Plan ("Disclosure Statement"), *see* Doc. 1028 in the South Edge Bankruptcy Case, "[p]roperty values were experiencing a boom at that time, and the land purchase price for Inspirada was a record purchase price for land in the Las Vegas Valley." Disclosure Statement at 19 n. 10.

**16.** In addition to obtaining financing from the Lenders, Inspirada was to be funded with capital contributions in the form of major infrastructure deposits from the Members ("MI Funds") as well as public local improvement district bonds issued and sold by the City of Henderson. Disclosure Statement at 19.

**17.** A copy of the Assignment Agreement is attached as Exhibit 3 to the Declaration of Todd A. Atkinson (Doc. 31) ("Atkinson Declaration").

sole remedy was to foreclose on the property.[18]

Each Member and its respective parent executed guaranties in favor of JPMorgan as agent under the Credit Agreement, including: (1) a completion guaranty, which guaranteed the completion of certain improvements and the payment of certain development costs; (2) a limited guaranty, which guaranteed the payment of damages related to certain fraudulent and/or unlawful acts; and (3) a repayment guaranty. Like the repayment guaranties executed by the other Members, the repayment guaranty executed by Meritage ("Repayment Guaranty")[19] was an unconditional guarantee that obligated Meritage to pay a portion of South Edge's outstanding loan balance if South Edge were to experience a "Bankruptcy Event" as defined in the Repayment Guaranty.

The term Bankruptcy Event was defined to include an involuntary bankruptcy in which an order for relief was entered,[20] but Meritage contends that the parties' agreement did not contemplate that the Members' obligations under the Repayment Guaranty could be triggered by an involuntary petition filed by JPMorgan and the other Lenders. Meritage contends that, if JPMorgan and the other Lenders were permitted to place South Edge into bankruptcy through an involuntary petition and collect the full amount of the debt directly from the Members, this would effectively convert debt that was intended to be non-recourse into recourse debt.

## C. Defaults Under the Loan, the Forbearance Agreement, Meritage's Attempt to Purchase Property in April 2008 and the Default Notices Sent in 2008

Although the purpose of South Edge's formation was to develop Inspirada, for a time starting in the year 2008, the company created more activity for workout, litigation and bankruptcy professionals than it did for the construction industry. The troubles at Inspirada arose, at least in part, from economic conditions affecting the real estate market in the United States generally—conditions that were felt more acutely in some areas of the country than in others. According to the Disclosure Statement, "[b]y early 2008, the real estate market had begun a dramatic decline that ultimately resulted in what has come to be known as the 'Great Recession' [with] [t]he Las Vegas area in particular [including Henderson] . . . hit hard by the real estate decline [and] certain Members . . . experiencing financial problems," resulting in two of the Members, Kimball Hill and Alameda, commencing their own bankruptcy proceedings. Disclosure Statement at 24–25.

---

18. Each party disputes many of the allegations made by the other. In providing the factual background set forth in this opinion, the Court makes no findings of fact relevant to the merits of the parties' underlying disputes.

19. A copy of the Repayment Guaranty is attached as Exhibit 2 to the Atkinson Declaration.

20. The Repayment Guaranty states:
 "Bankruptcy Event" means that (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed against Borrower seeking liquidation, reorganization or other relief under any bankruptcy law now or hereafter in effect and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) Borrower shall voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy law now or hereafter in effect.
 Repayment Guaranty § 1(a).

South Edge failed to make the interest payment due under the Loan in February 2008, causing JPMorgan to issue a formal default notice in March 2008, which was followed by other alleged defaults under the Credit Agreement. Meritage alleges that South Edge's default under the Credit Agreement occurred over its objection and that it took the position that the Members should, through a capital call, contribute funds to make the interest payment. Meritage, which had made its first required takedown of property in 2007, also alleges that, despite the defaults under the Credit Agreement, it took all of the steps necessary to make its second and final takedown under the Acquisition Agreement (scheduled for April 2008), including depositing the required closing funds into escrow. According to Meritage, JPMorgan wrongfully refused to accept the Release Price and release its lien, so that Meritage was unable to purchase and resell the property at a time when the real-estate market in Henderson had not yet hit bottom.

An attempt to restructure the Loan consensually began when the parties entered into a forbearance agreement ("Forbearance Agreement") in May 2008, but those efforts soon ended without a restructuring agreement.[21] In December 2008, JPMorgan sent South Edge (and all the non-bankrupt Members and their parents) notices alleging multiple defaults under the Credit Agreement.

## D. Litigation Commenced by JPMorgan in 2008

In December 2008, JPMorgan also commenced several lawsuits against the non-bankrupt Members and their parents, including two lawsuits against Meritage. One of those lawsuits, which was commenced in the Nevada Federal District Court, sought to enforce the Lenders' interest in the collateral pledged pursuant to the Credit Agreement and requested damages for alleged breaches by Meritage of the Acquisition Agreement and the Assignment Agreement ("UCC Action"). The other lawsuit, originally filed in the United States District Court for the Southern District of New York but later transferred to the Nevada Federal District Court at the request of the defendants, was based on the completion guaranty executed by Meritage ("Completion Guaranty Action"). The Members, including Meritage, moved for leave to amend their answer in one of those lawsuits to include a counterclaim asserting that JPMorgan had violated its covenant of good faith and fair dealing by commencing the South Edge Bankruptcy Case. The Nevada Federal District Court held that the members had "waived any and all counterclaims whatsoever under the plain language of the Guarantees" and that "[a]mendment as to the breach of the covenant of good faith and fair dealing claim therefore is futile, as Defendants have waived it." *JPMorgan Chase Bank, N.A. v. KB Home,* 740 F.Supp.2d 1192, 1202, 1203 (D.Nev.2010) (relying on the provisions of the Repayment Guaranty and other guarantees providing that (1) "[t]he liability of the Guarantor under this Guaranty is absolute, irrevocable and unconditional irrespective of: ... (e) any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the [Credit] Facility Documents or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrower or a guarantor" and that (2) the

---

21. A copy of the Forbearance Agreement is attached as Exhibit 4 to the Atkinson Declaration.

Guarantor "waives any right to interpose any counterclaim related to this guaranty or the transactions contemplated hereby in such action"). The Nevada Federal District Court also held that "New York law governs the guarantees." *JPMorgan Chase Bank,* 740 F.Supp.2d at 1201.

The UCC Action and the Completion Guaranty Action, along with similar actions against other Members, were consolidated for discovery purposes in a single proceeding, Case No. 08–1711, before the Nevada Federal District Court. In both the UCC Action and the Completion Guaranty Action, Meritage asserted counterclaims against JPMorgan. *See* Notice of Removal, Ex. 2. JPMorgan moved for summary judgment on those counterclaims, arguing that, pursuant to the Forbearance Agreement, the Members and their parents provided full releases of all claims against JPMorgan. The Nevada Federal District Court ruled in favor of JPMorgan on the release issue and granted its motion for summary judgment. *See* Notice of Removal, Ex. 2, at 9 (holding that "[t]he Release provision therefore bars Meritage from asserting counterclaims arising from the Credit Agreement that were available at the time Meritage voluntarily signed the Forbearance Agreement"). The Nevada Federal District Court also stated that "JPMorgan has not argued in this motion that the Release applies to affirmative defenses" and that "[t]he Court expresses no opinion on the Release's applicability to defenses." *See id.* at 9 n. 6.

As of the date of the Hearing, the UCC Action and the Completion Guaranty Action were pending before the Nevada Federal District Court, *see* Docs. 420 & 421 in Case No. 08–1711, but they were later dismissed against Meritage without prejudice because, under the Plan, only the Lenders or the representative of the Estate would have the right to pursue those actions. *See* Tr. at 89.

### E. Arbitration Proceeding Commenced by Focus

In June 2009, Focus requested that it be permitted to compel an arbitration against Meritage and the other non-bankrupt Members of South Edge on behalf of itself and purportedly on behalf of South Edge ("Focus Arbitration"). The Nevada Federal District Court granted the request to compel arbitration. In the Focus Arbitration, Focus alleged that the Members had delayed takedown schedules, failed to make interest payments and ceased construction on Inspirada, all in violation of the parties' agreements. The arbitration panel ultimately determined that certain of the Members, including Meritage, breached certain of their obligations under the Operating Agreement. *See* Declaration of Cynthia Nelson, Chapter 11 Trustee, in Support of Confirmation of the Plan of Reorganization ("Nelson Declaration") at 9.[22] The arbitration panel dismissed any claims brought by Focus on behalf of South Edge on the basis that Focus lacked standing to bring them. As discussed below, the Estate retained those claims pursuant to the Plan.

Meritage requested that the Nevada Federal District Court vacate the arbitration award, but that court denied the motion to vacate and entered an order confirming the award. The Ninth Circuit affirmed. *See JPMorgan Chase Bank, N.A. v. KB Home Nevada Inc.,* 2012 WL 639247 (9th Cir. Feb. 29, 2012).[23]

---

**22.** A copy of the Nelson Declaration is attached as Exhibit 2 to the Supplemental Declaration of James E. Hough, Esq. (Doc. 58) ("Supplemental Hough Decl.").

**23.** The affirmance did not extend to Meritage's appeal of the arbitration panel's denial of the counterclaim Meritage had asserted against South Edge in the arbitration because

## F. Commencement of the South Edge Bankruptcy Case and Developments in the Case Prior to Confirmation

Approximately two years after the disputes between the Lenders and the Members began, on December 9, 2010, JPMorgan (in its individual capacity as a lender under the Credit Agreement) joined two of the other Lenders in filing an involuntary Chapter 11 petition against South Edge in the Nevada Bankruptcy Court. In its capacity as agent for the Lenders, JPMorgan also filed a motion seeking appointment of a Chapter 11 trustee for the Estate. After a contested hearing—South Edge had filed a motion to dismiss the petition and an objection to the motion for appoint of a trustee—the Nevada Bankruptcy Court entered an order for relief against South Edge and an order directing the appointment of a Chapter 11 trustee. The United States Trustee appointed Cynthia Nelson ("Nelson") to serve as Chapter 11 trustee of the Estate, and the Nevada Bankruptcy Court entered an order approving the appointment.

In May 2011, Nelson commenced an adversary proceeding against JPMorgan and Focus and certain of its affiliates with respect to certain "MI Funds" that Focus had caused to be paid into a JPMorgan account in October 2007 to cover major infrastructure costs ("MI Adversary Proceeding"). In the MI Adversary Proceeding, Nelson alleged, among other things, that the deposit in the name of Focus was property of the Estate, subject to JPMorgan's lien. Focus denied that the MI Funds it placed into the account at JPMorgan were property of the Estate.

In June 2011, JPMorgan made a demand on Meritage for payment under the Repayment Guaranty. On behalf of the Lenders, in June 2011, JPMorgan also entered into a letter agreement with KB Home Nevada, Inc.; Coleman–Toll Limited Partnership; Pardee Homes of Nevada, Inc.; and Beazer Homes Holdings Corp. and their respective Parent Guarantors (collectively, the "Settling Builders") regarding a term sheet ("Term Sheet") for a consensual Chapter 11 plan of South Edge ("Plan Support Agreement"). *See* Nelson Decl. at 8.

Nelson consented to the Plan Support Agreement subject to certain clarifications, limitations and qualifications (none of which is relevant here). She also filed a motion for an order approving a settlement of the MI Adversary Proceeding. The motion requested that the MI Adversary Proceeding be resolved by a final judgment providing that, among other things, a portion of the MI Funds be deemed property of the Estate, subject to the valid, nonavoidable liens of JPMorgan on behalf of the Lenders, and free and clear of liens, claims or interests of Focus, and that the remaining balance be considered property of Focus, free and clear of liens, claims or interests of the South Edge, the Estate and the Lenders. The motion also noted that, if the settlement were approved by the Nevada Bankruptcy Court, the disputes and litigation among the major constituencies in the South Edge Bankruptcy Case, including Focus and all of the Members other than Meritage, would be resolved.[24] According to

---

that counterclaim was subject to the automatic stay. The Nevada Bankruptcy Court subsequently lifted the automatic stay for the limited purpose of permitting Meritage to pursue its appeal against South Edge, an appeal that remains pending.

24. The only Member other than Meritage that filed an objection to the Plan was Alameda, which had commenced its own bankruptcy case; that objection was resolved. Kimball Hill, which is not one of the Settling Builders, had also commenced a bankruptcy case; it did not file an objection to the Plan. *See*

Nelson, the only alternative to the Plan was "litigation against certain equity members of South Edge and their parent companies[,]" and, "[w]hile [she] believe[d] that the Estate has a strong case against the Settling Builders and Meritage.... [She understood] that the potential damage awards to the Estate based upon those claims could vary widely from a net zero in damages to in excess of $500 million in damages...." Nelson Decl. at 3.

The Nevada Bankruptcy Court entered an order approving the settlement agreement ("Settlement Agreement") among Nelson, the Settling Builders, Focus and related entities, JPMorgan (in its capacity as administrative agent for the Lenders) and Inspirada Builders, LLC ("Inspirada Builders"). As described in more detail below, Inspirada Builders became the acquirer of South Edge's real property and certain other assets under the Plan, as well as the representative of the Estate ("Estate Representative").

JPMorgan and the Settling Builders filed a proposed Chapter 11 plan on August 1, 2011. *See* Doc. 844 in the South Edge Bankruptcy Case. Nelson described the Plan in broad strokes as follows:

> [Under the Plan][,] the claims of [JPMorgan and the Lenders] would be deemed satisfied, all administrative expense and priority unsecured claims would be paid in full, the outstanding

obligations under [the] post-petition financing facility with affiliates of the Settling Builders ... would be repaid, unsecured creditors, who in my view almost certainly would otherwise not be entitled to a recovery from the Estate (because [JPMorgan's] secured claims are materially undersecured and, at this time, there are no known unencumbered assets from which to pay unsecured creditors), would be entitled to share in a $1 million distribution funded by the Settling Builders, and the Settling Builders, via their ownership interest in [Inspirada Builders], would become the indirect owners of the Project.

> The Plan is premised, among other things, upon a settlement and release of any potential litigation claims that the Estate could pursue against the Settling Builders.

*See* Nelson Decl. at 8, 14. The Plan, which was amended as of October 21, 2011, provided that the Settling Builders "shall ... contribute sufficient cash ... to the account of the Estate Representative to fund payments required under this Plan to (a) Holders of Allowed Claims (to the extent such payments are not provided to be paid from other funds, such as the MI Funds ...) and (b) Holders of Allowed Administrative Expenses, Gap Claims, Priority Tax Claims, and TIP Loan Claims."[25]

---

Nelson Decl. at 6 n. 3 ("Each of Kimball Hill and Alameda filed for bankruptcy protection well in advance of the filing of the Involuntary Petition. Each of Kimball Hill and Alameda purported to reject the [Operating Agreement] in its respective bankruptcy case. I understand that Kimball Hill and Alameda are now each represented by a liquidating trustee under confirmed plans of reorganization.").

**25.** Under the Plan, a " 'Gap Claim' means a Claim arising in the ordinary course of the Debtor's business or financial affairs after the

Petition Date but before the Relief Date, as allowable pursuant to Bankruptcy Code section 502(f)[,]" Plan at 8, and " 'TIP Loan Claims' means the Claims of the TIP Loan Lenders on account of the Bankruptcy Code section 364 financing they provided to the Trustee, on behalf of the Estate, pursuant to the Final TIP Order." Plan at 14. " 'TIP Loan Lenders' mean[s] KB Home NV Acquisition LLC, Toll Henderson II LLC, Pardee Homes, a California corporation, and Trinity Homes, LLC." *Id.*

In exchange for the contributions of cash by the Settling Builders, the Plan provided that Inspirada Builders:

shall obtain, free and clear of all liens, claims, and encumbrances, all of the Assets of the Debtor and the Estate, including, among other things, (a) all real and personal property owned by the Debtor and the Estate not otherwise settled or released under the Plan, and (b) the Retained Actions; [26].... Notwithstanding the foregoing, the Settling Builders may, in their sole and absolute discretion, elect to leave certain Assets in the Estate, as may be identified in a filing with the Bankruptcy Court prior to the Effective Date.

Plan § 6.2. As discussed below, the Settling Builders ultimately made the election to leave certain assets, including claims against Meritage under the Operating Agreement, in the Estate.

During the hearing on confirmation of the Plan, counsel for the Settling Builders explained the reason for the continued existence of the Estate and its retention of the Retained Actions as follows:

MR. SHAFFER: Under this plan, we are not having the estate assets revest. We're having the estate assets stay.

Part of that is because of our agreement with the City of Henderson to keep the development agreement in the estate until we were finished with the deal.

But I'll be quite frank. We are also planning to keep causes of action under the existing operating agreement in the estate while those actions are pursued.

We think that that will reduce the chance of mischief of people arguing about, you know, wrong party asserting the claims or new defenses because of an assignment of those claims or something of that matter.

So the plaintiff in the action that will be filed against Meritage for a violation of the operating agreement and failure to make capital contributions will be an estate cause of action brought through the estate representative.

See Doc. 58, Ex. 1 at 123:6–21.

Under the Plan, if Meritage did not become a Settling Builder, then Meritage's alleged liabilities under the Repayment Guaranty and the other guarantees would not be released, and the Settling Builders would pay into an escrow account an amount equal to the portion of the Settling Builders' consideration to be paid under the Plan that was equal to the amount of the alleged liability of Meritage on the Repayment Guaranty, which was estimated to be between $12.4 million and $12.8 million. The Plan also provided the Lenders the option of electing to sell to the Settling Builders a participation in the selling Lender's pro rata interest in the claim against Meritage under the Repayment Guaranty. See Plan at 20–21.

### G. Meritage's Proof of Claim

While the negotiation and formulation of the Plan was proceeding, in July 2011, Meritage Nevada filed a proof of claim ("Meritage Proof of Claim") asserting an unliquidated proof of claim in the South Edge Bankruptcy Case.[27] In the Meritage

---

26. The Plan's definition of "Retained Actions" is as follows:

[A]ll Claims and other Causes of Action that [Nelson], [South Edge], or the Estate could assert immediately prior to the Effective Date, including but not limited to (x) Avoidance Actions, and (y) Claims and Causes of Action under the Operating Agreement, but

excluding all Causes of Action released, waived, or extinguished pursuant to this Plan or a Final Order.
Plan at 12–13.

27. A copy of the Meritage Proof of Claim is attached as Exhibit 2 to the Initial Hough Declaration.

Proof of Claim, Meritage Nevada asserts a claim for, among other things, indemnification from the Estate for any recovery that JPMorgan might obtain from Meritage Nevada under the Repayment Guaranty. In this regard, the Meritage Proof of Claim states as follows: "[I]f JPMorgan sues Meritage on the [R]epayment [G]uaranty, Meritage will be forced to incur further attorneys' fees and costs defending that proceeding. [South Edge's] failure to perform is the cause of Meritage's involvement [in any such lawsuit], and Meritage is entitled to indemnification for all amounts, including defense costs and any judgment that JPMorgan might obtain." Meritage Proof of Claim at 3–4.

### H. The State Court Action

JPMorgan served a demand upon Meritage for payment under the Repayment Guaranty, but Meritage did not respond by making any payment. Rather, on August 19, 2011 (after the initial version of the Plan was filed but prior to confirmation of the Plan), Meritage commenced the State Court Action. Meritage asserts four causes of action in the State Court Complaint.[28] In Count One, Meritage seeks damages allegedly resulting from a breach of the Assignment Agreement. That breach, Meritage alleges, occurred when JPMorgan refused to accept the Release Price and release its lien, causing Meritage to be unable to complete its second and final purchase of property at Inspirada. In Count Two, Meritage contends that JPMorgan's refusal to accept the Release Price and release its lien, as well as its causing Meritage to enter into the Forbearance Agreement, violated its covenant of good faith and fair dealing. Meritage seeks damages in excess of $8 million for the alleged breaches that are the subject of Count One and Count Two. In Count Three, Meritage seeks a declaration that the Forbearance Agreement lacked consideration and is invalid because it was procured by fraud, duress and breach of contract and that the releases contained in the Forbearance Agreement are unenforceable. In Count Four, Meritage requests a declaratory judgment that JPMorgan has no rights against Meritage under the Repayment Guaranty based on three arguments: (1) that "Meritage tendered full payment to JPMorgan in April 2008, which under Section 2(c) of the Repayment Guaranty resulted in a termination of the obligations imposed under the Repayment Guaranty[;]" (2) that "by wrongfully refusing to accept Meritage's payment and refusing to issue a partial lien release, JPMorgan committed a material breach of the Assignment Agreement extinguishing JPMorgan's rights against Meritage under the Repayment Guaranty and relieving Meritage of any further obligation to JPMorgan under the Repayment Guaranty[;]" and (3) "the parties did not intend that a Bankruptcy Event, as defined, allowed an involuntary bankruptcy initiated by JPMorgan to trigger its rights under [the] Repayment Guaranty, and that it would be beyond the reasonable expectations of the parties and unconscionable to interpret the Repayment Guaranty as allowing JPMorgan to initiate an involuntary bankruptcy of South Edge so as to trigger its rights under the Repayment Guaranty against the Members, including Meritage." State Court Complaint ¶ 94.

In the counterclaim it filed in this Court, JPMorgan contends that "a Bankruptcy Event has occurred, thereby triggering . . . Meritage's liability under the Repay-

---

**28.** A copy of the State Court Complaint is attached as Exhibit 1 to the Notice of Removal.

ment Guaranty." *See* Doc. 10 at 17. According to the counterclaim, "the amount owed by Meritage under the Repayment Guaranty on August 22, 2011 was at least $13,394,644.97, exclusive of accruing attorneys' fees and costs." *See* Doc. 10 at 23.

## I. Nevada Repayment Guaranty Action and Notice of Removal

In August 2011, after Meritage filed the State Court Complaint but before the Removal Date, JPMorgan commenced an action against Meritage in the Nevada District Court captioned *JPMorgan Chase Bank, N.A. v. Meritage Homes Corp.*, Case No. 11–1364 ("Nevada Repayment Guaranty Action"). The complaint in the Nevada Repayment Guaranty Action, which is substantially identical to the counterclaim that JPMorgan asserted in the State Court Action after it was removed to this Court, alleges that Meritage breached the Repayment Guaranty when it refused JPMorgan's demand for payment in response to the triggering events of South Edge's bankruptcy case. The Nevada Repayment Guaranty Action remains pending.

## J. Confirmation and Implementation of the Plan

In October 2011, Meritage filed an objection to confirmation of the Plan.[29] In its objection, Meritage alleged, among other things, that: (1) the Plan was a "legal fiction" designed in part to obtain a finding of good faith for the proponents of the Plan—JPMorgan and the Settling Builders—but that the Plan in fact was not proposed in good faith; (2) the Plan was not fair and equitable to, and unfairly discriminated against, Meritage; and (3) a representative of the Estate would be re-

taining actions against Meritage while at the same time Meritage would be precluded from asserting claims against South Edge or the Settling Builders, including by means of setoff.

The provision of the Plan that Meritage contended would prevent it from exercising its right of setoff, § 8.3, provides as follows:

> Because the Debtor will be liquidating its Assets, the Debtor will not receive a discharge **under this Plan. However, until all remaining Assets of the Reorganized Debtor and the Estate are administered, and except as otherwise provided in this Plan or the Confirmation Order, all entities shall be barred from asserting against the Debtor, the Estate, or the Reorganized Debtor, or their respective successors or property, any other or further Claims, demands, debts, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, cause, transaction, state of facts, or other activity of any kind or nature that occurred prior to the Effective Date.**

Plan § 8.3.

Section 8.3 of the Plan bars claims against the Estate "except as otherwise provided in this Plan or the Confirmation Order." Plan § 8.3. The Plan defines "Secured Claims" to include claims for setoff under § 553 of the Bankruptcy Code. *See* Plan § 1.1 (" 'Secured Claims' means any Claims secured by valid, perfected, and nonavoidable Liens on Collateral to the extent of the value of such Collateral (a) as set forth in this Plan, (b) as agreed to by the Holder of such Claim and the Plan Proponents, or (c) as determined by a Final Order of the Bankruptcy Court in

---

**29.** A copy of Meritage's objection to confirmation is attached as Exhibit 5 to the Atkinson

Declaration.

accordance with Bankruptcy Code section 506(a) or, in the event that such Claim is subject to setoff under Bankruptcy Code section 553, to the extent of such setoff."). Under the Plan, allowed setoff claims are classified as "Class S1—Other Secured Claims." *See* Plan § 3.2.

In fact, during the hearing on confirmation of the Plan, the Nevada Bankruptcy Court inquired of counsel for the Settling Builders regarding the concern that the Plan would prohibit Meritage from asserting setoff rights, and the following colloquy occurred on the record:

> THE COURT: So your answer ... with respect to 8.3 is that let's look to the rest of the plan because to the extent they have any rights against the reorganized debtor those would be setoff rights under 553 and 506 secured claims.
>
> MR. SHAFFER: Exactly. They can't actually affirmatively collect anything, but their unsecured claim would, in essence, morph into a secured claim to the extent ...
>
> THE COURT: Right.
>
> MR. SHAFFER:—of a valid offset.
>
> THE COURT: Right. Okay.
>
> MR. SHAFFER: And nobody in the plan—and there will be a transcript of this hearing. Nobody in the plan is trying to prevent them from asserting offsets.

*See* Supplemental Hough Decl. Ex. 1, at 125:8–22.

On October 27, 2011, the Nevada Bankruptcy Court overruled Meritage's objections to the Plan and entered the Confirmation Order.[30]

As stated above, the parties have filed the Stipulated Chart, which depicts the implementation of the Plan as of the Effective Date. The Stipulated Chart requires some textual explanation here. Keeping in mind that the purpose of the Stipulated Chart is to assist the Court in determining whether the State Court Action could conceivably have any effect on the Estate, the Court begins at the top center of the Stipulated Chart, in the box labeled "South Edge, LLC Estate." Three arrows radiate from that box—one of those arrows is attached to a box reflecting that $21 million in MI Funds were transferred to JPMorgan in its capacity as administrative agent for the Lenders (pursuant to the settlement of the MI Adversary Proceeding described above);[31] a second arrow is attached to a box showing that there was an "Asset Transfer" to the "Acquirer," Inspirada Builders; and a third arrow is attached to a box indicating that "Retained Actions and City of Henderson Contract Rights" were transferred to the Estate. The Retained Actions included the Estate Representative's actions against Meritage under the Operating Agreement. As the Confirmation Order stated with respect to the Retained Actions and other assets retained by the Estate,

> [p]ursuant to Section 6.2 of the Plan, the Retained Actions are being left in the Estate, to be administered by the Estate Representative in accordance with the Plan, as well as the City and County-related rights and agreements included in Section 5.5 of the Plan. This Confirmation Order shall constitute notice of the Settling Builders' intention to keep the Retained Actions in the Estate as of the Effective Date, rather than

---

**30.** A copy of the Confirmation Order is attached as Exhibit 1 to Doc. 52.

**31.** The transfer of the MI Funds to JPMorgan is referenced on the Stipulated Chart, but no

party contends that this transfer is relevant to the issue of whether the State Court Action could conceivably have any effect on the Estate.

assigning them to the Acquirer. The Estate Representative shall have the full authority to pursue the Retained Actions after the Effective Date, and confirmation of the Plan shall not in any way release, impair, or otherwise prejudice the Estate Representative's pursuit of such Retained Actions, *including, but not limited to, causes of action against the Meritage Parties for unfunded capital calls and other claims and causes of action arising under or relating to the Debtor's Operating Agreement.*

Confirmation Order § III.C.10 (emphasis added).[32]

As set forth in the Stipulated Chart, on the Effective Date, the Estate (1) transferred to Inspirada Builders "virtually all assets including real property but not litigation claims [against] Meritage" and (2) "continue[d] to exist[,]" retaining certain assets, including litigation claims against Meritage under the Operating Agreement. According to a box labeled "Estate" at the center left of the Stipulated Chart and a footnote to that box, the Estate "[o]wns assets not assigned to [Inspirada Builders]" (including the litigation claims against Meritage under the Operating Agreement) and, with respect to those assets retained by the Estate, Inspirada Builders is the representative of the Estate ("Estate Representative"). In short, Inspirada Builders obtained the ownership of land and other assets, which it apparently intends to develop into a planned community in Henderson, while the Estate (1) continues to exist after the Effective Date and (2) retains certain assets (including claims against Meritage under the Operating Agreement but not claims under the Repayment Guaranty).

The box at the very center of the Stipulated Chart reflects that the Settling Builders received ownership of Inspirada Builders in exchange for the compromises set forth in the Plan and their funding of the Plan. Three boxes labeled "Funded by Settling Builders" radiate from the "Settling Builders" box—one extending to the right of the Stipulated Chart into the area at the top of which appears a box labeled "Lender Group JPMorgan—Administrative Agent," and two extending into the Estate.

The right side of the Stipulated Chart summarizes the Settling Builders' payment of funds to JPMorgan in the aggregate amount of $335 million. This amount includes $21 million in MI Funds, plus $313.5 million on the Lenders' secured claims and $500,000 on their unsecured claims.[33] As part of the funding of the combined $314 million on the Lenders' secured and unsecured claims, the Settling Builders agreed to fund the "Meritage Repayment Guaranty Escrow" in the approximate amount of

---

**32.** On November 17, 2011, the Settling Builders, in accordance with § 6.2 of the Plan, filed a notice of election stating that the assets identified in § III.C.10 of the Confirmation Order would remain in the Estate. *See* South Edge Bankruptcy Case, Doc. 1379.

**33.** The Lenders asserted a total claim of approximately $382 million. *See* Confirmation Order at 11 n. 1 ("The Prepetition Lenders asserted a total Claim against the Debtor as of the Petition Date of $367,538,209.77, including unpaid principal and interest through that date. The Agent asserts that the Debtor's outstanding indebtedness to the Agent and the Prepetition Lenders under the Prepetition Credit Agreement and related documents would amount to approximately $382 million as of the projected November 30, 2011 Effective Date of the Plan. Pursuant to the unchallenged testimony of the Chapter 11 Trustee in the Nelson Declaration, the Chapter 11 Trustee believes that figure accurately represents the amount of the outstanding indebtedness that would exist under the terms of the Prepetition Credit Agreement as of November 30, 2011. Accordingly, this Court adopts and finds those Claim amounts to be accurate.").

$13 million. The Settling Builders funded the Meritage Repayment Guaranty Escrow in the amount of the alleged liability of Meritage on the Repayment Guaranty, in return for which the Settling Builders obtained the right to pursue claims against Meritage under the Repayment Guaranty. Under the Plan, the Lenders had the option of either retaining the right to pursue Meritage under the Repayment Guaranty or electing to receive their pro rata share of the Meritage Repayment Guaranty Escrow. According to the Stipulated Chart, each of the Lenders elected to receive a pro rata distribution from the Meritage Repayment Guaranty Escrow.

Two boxes labeled "Funded by Settling Builders" appear in the area to the center left of the Stipulated Chart. As described in the lower of these boxes, the Settling Builders agreed to provide $1 million to fund payments to the holders of general unsecured claims. That amount has been funded. Under the funding commitment summarized in the upper box labeled "Funded by Settling Builders," the Settling Builders agreed to make payments to the holders of allowed "[Gap] Claims, Administrative Claims, Priority Claims & TIP Loan Claims." A footnote to the Stipulated Chart states: "Per the Plan, allowed Administrative, [Gap Claims], assumption/rejection and Priority claims entitled to payment under the Plan are funded by the Settling Builders[,]" with the "[a]dministration and payment of such claims [being] made by the Estate by the Estate Representative." The footnote also states that "[a]ny funds remaining in the Estate after such distributions and including the net recoveries on all Retained Actions (including litigation claims against Meritage) and other assets, if any, will flow to the benefit of the Acquirer, which is 100% owned by the Settling Builders."

The Stipulated Chart also addresses the Meritage Proof of Claim and the potential treatment of a setoff claim by Meritage. The Meritage Potential Offset box states: "Lenders and Settling Builders contend Meritage has a duty to pay under the Repayment Guaranty. Meritage denies such duty. Lenders and Settling Builders contend Meritage's Indemnity Claim (which is premised on the possibility Meritage may pay under the Repayment Guaranty) may have setoff value against the Estate Representative's potential claims against Meritage." Similarly, the Meritage Asserted Indemnity Claim box states: "Any allowed indemnity claim will not receive [a] distribution under Plan. To the extent the indemnity claim is allowed, it may have setoff value per the Plan treatment of Class S1 claims, against recovery on Litigation Claims."

### K. Appeal of the Confirmation Order

In November 2011, Meritage appealed the Confirmation Order. That appeal is pending before the Nevada Federal District Court, Case No. 11–1963. As one of the proponents of the Plan, JPMorgan is a party to the appeal.

Meritage's original statement of issues on appeal identified certain issues that called into question confirmation of the Plan in its entirety, such as whether the Nevada Bankruptcy Court's finding that the Plan was proposed in good faith was clearly erroneous. The Amended Statement was filed, according to Meritage, because that issue and certain other issues were mooted by its failure to obtain an appeal bond and therefore a stay pending appeal. In the Amended Statement, Meritage states that it "does not intend to challenge on appeal any finding of fact or conclusion of law that, if reversed, would require that the [Confirmation] Order be vacated in its entirety or preclude trans-

fers of property or funds under the Plan." The Amended Statement sets forth the following six issues on appeal:

1. Whether the [Nevada] Bankruptcy Court erred in approving a release and exculpation in favor of third-party, non-debtor parties with respect to "any act or omission in connection with, relating to, or arising out the Chapter 11 Case, the formulation, negotiation, implementation, confirmation, or consummation of th[e] Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document entered into during the Chapter 11 Case or otherwise created in connection with th[e] Plan . . . ."

2. Whether the [Nevada] Bankruptcy Court erred in concluding that the release of and permanent injunction against prosecution of third party claims against non-debtors "(i) are within the jurisdiction of the Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan; (iii) confer material benefit on . . . [the] Debtor, the Estate, and Holders of Claims against the Debtor, and are important to the overall objectives of the Plan; (iv) are consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code; [and] (v) are in exchange for valuable consideration . . . ."

3. Whether the [Nevada] Bankruptcy Court erred by approving a post-confirmation injunction in favor of a liquidating debtor that retains claims against Meritage, and its successors, enjoining Meritage from asserting, inter alia, "rights . . . based upon any act . . . that occurred prior to the Effective Date." ["Third Issue on Appeal"]

4. Whether the [Nevada] Bankruptcy Court erred in ruling that "because the Plan is a good faith settlement as to the Released Parties, no co-defendant or joint tortfeasors shall have any indemnity or contribution claims, which shall be disallowed by the application of Bankruptcy Code section 502(e), by California Code of Civil Procedure section 877.6 (which shall apply to the maximum extent permitted by applicable law), Nevada Revised Statute 17.245, and any similar law of any other jurisdiction."

5. Whether the [Nevada] Bankruptcy Court erred in ruling that "[t]he Plan's treatment of the Class S3 and U1 Claims will not affect the Meritage Parties' liability on their Repayment, Completion, and Limited Guaranties, which are not being satisfied or released under the Plan."

6. Whether the [Nevada] Bankruptcy Court erred in making findings of fact and conclusions of law which conclude that any and all actions taken by third-party non-debtors in the bankruptcy case are in compliance with applicable state and federal non-bankruptcy law.

## L. The Arbitration Proceeding Commenced by the Estate Representative

In March 2012, the Estate Representative filed with the Nevada Bankruptcy Court a motion for an order compelling arbitration of: (1) the Estate's claims against Meritage under the Operating Agreement; and (2) the Meritage Proof of Claim ("Arbitration Motion"). *See* Notice of Related Filing ("Notice of Related Filing") (Doc. 60), Ex. 2. The Arbitration Motion states that the panel deciding the arbitration proceeding commenced by Focus did not award South Edge damages only because it found that Focus lacked standing to assert claims on behalf of South Edge, while the Estate Representative "has the standing Focus lacked, because it is the Estate Representative of

South Edge's bankruptcy estate, and will be pursuing the arbitration on behalf of the estate." Arbitration Motion at 3.

Attached to the Arbitration Motion is an arbitration demand in which the Estate Representative alleges that Meritage Nevada breached the Operating Agreement by inadequately funding South Edge and by failing to build out Inspirada ("Arbitration Demand"). *See* Notice of Related Filing, Ex. 1. The Estate Representative requests damages on behalf of the Estate in an amount not less than $23,298,000. *See* Arbitration Demand at 16.

## IV. Legal Analysis

### A. The Relatedness of the State Court Action to the South Edge Bankruptcy Case

JPMorgan contends that the relatedness of the State Court Action to the South Edge Bankruptcy Case provides a means of passage for the transfer of the parties' dispute with respect to the Repayment Guaranty to the Nevada Federal District Court, while Meritage argues that a lack of relatedness establishes a barrier between the Ohio State Court and the Nevada Federal District Court that JPMorgan should not have crossed. The Court addresses this gateway issue in the remainder of the opinion.

If the State Court Action was not related to the South Edge Bankruptcy Case on the Removal Date, then there was no basis for removal, no federal court has jurisdiction over the State Court Action, and the parties' arguments regarding the relative merits of transfer and equitable remand would be beside the point. *See New England Wood Pellet, LLC v. New England Pellet, LLC,* 419 B.R. 133, 136–37 (D.N.H. 2009) ("If subject matter jurisdiction is lacking, there is no power to do anything with the case except dismiss or remand it."); *Rayonier Wood Prods., L.L.C. v.*

*Scanware, Inc. (In re Scanware, Inc.),* 411 B.R. 889, 893 (Bankr.S.D.Ga.) ("When presented with a motion to remand or a motion to transfer the venue of a proceeding which has been removed from the state court, the bankruptcy court must first evaluate whether the state court action was properly removed; that is, it must determine whether it has subject matter jurisdiction over the proceeding. If there is a jurisdiction defect and the parties and the action are not properly before the Court, any action taken by the Court would be void." (citations and internal quotation marks omitted), *aff'd,* 420 B.R. 915 (S.D.Ga.2009)).

The burden of demonstrating that the federal jurisdictional requirements for removal have been satisfied rests with the defendant. *See Vill. of Oakwood v. State Bank & Trust Co.,* 539 F.3d 373, 377 (6th Cir.2008). JPMorgan, therefore, has the burden of proving relatedness.

Another issue raised by the parties is the date on which a matter needs to be related to the bankruptcy case in order for removal to be appropriate. JPMorgan contends that all that matters for purposes of removal is whether a matter was related to the bankruptcy case on the date of removal. Meritage, by contrast, argues that events occurring after the date of removal are relevant to the issue of whether removal was appropriate. By far, the majority view is that courts are not required to "constantly ... revisit jurisdictional findings to determine whether the effect of the litigation on the bankruptcy remains 'conceivable'" because "federal jurisdiction arising under Section 1334 is determined ... on the basis [of] the facts at the time of removal." *In re WorldCom, Inc. Sec. Litig.,* 294 B.R. 553, 556 (S.D.N.Y.2003) (citing *Bissonnet Invs. LLC v. Quinlan (In re Bissonnet Invs. LLC),* 320 F.3d 520, 525 (5th Cir.2003);

*Cont'l Nat'l Bank of Miami v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1346 n. 8 (11th Cir.1999); *Owens–Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 626 (4th Cir.1997)). *See also Specialty Mills*, 51 F.3d at 774 & n. 5 ("[I]t must be determined whether, at the time CSB removed appellants' action to the bankruptcy court, the outcome of the case conceivably could have affected the administration of Dakota Oat's bankruptcy estate. Subject matter jurisdiction should be determined at the time of removal, when federal jurisdiction was invoked."). Meritage relies on *SG & Co. Northeast, LLC v. Good*, 461 B.R. 532, 537–38 (Bankr.N.D.Ill. 2011), in support of its argument that subsequent events may divest a federal court of related-to jurisdiction. The Court need not decide between the majority view and the minority view represented by *SG & Co.* because, as explained below, the State Court Action was related to the South Edge Bankruptcy Case on the Removal Date and continues to be related as of the present time. In fact, as explained below, the event on which the *SG & Co.* court relied in finding a lack of continued jurisdiction—the "transfer of property out of the estate[,]" *SG & Co.*, 461 B.R. at 540—does not apply here.

Even under the majority view, continued relatedness as of the present time is relevant to the issue of whether the State Court Action should be remanded to the Ohio State Court or transferred to the Nevada Federal District Court. Continued relatedness remains legally relevant because, as explained in more detail in § IV.B of this opinion, one of the most important considerations bearing on the transfer analysis is the strong presumption that a proceeding that could conceivably have an effect on a bankruptcy estate should be decided in the district where the bankruptcy case is pending. Although a proceeding could conceivably have had an effect on the estate on the date of removal, so that a federal court will have related-to jurisdiction to decide the matter, subsequent events, while not divesting the court of jurisdiction, might counsel against transfer if those events mean that the proceeding could no longer conceivably have an effect on the estate. The Court, therefore, will analyze relatedness both on the Removal Date and as of the present time.[34]

---

**34.** Another threshold issue is which materials the Court may consider for purposes of the relatedness and removal analysis. Although the parties have not raised this issue, it is nonetheless appropriate for the Court to do so because "courts construe removal statutes strictly with all doubts resolved in favor of remand...." *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206 n. 12 (3d Cir.2003). The only documents attached to the Notice of Removal were the State Court Complaint and an opinion by the Nevada Federal District Court. It would have been better if JPMorgan had provided the other documents on which it ultimately relied at the time it filed the Notice of Removal. For the purpose of analyzing relatedness on the Removal Date and the appropriateness of removal, however, the Court may consider not only the Notice of Removal and the documents attached to it, but also the parties' stipulations and other documents filed on the record, including the documents attached to the various affidavits filed in this matter. *See id.* ("The Supreme Court has upheld removal where jurisdictional facts required to support the removal were found in later-filed affidavits rather than in the notice of removal.") *Willingham v. Morgan*, 395 U.S. 402, 407 n. 3, 89 S.Ct. 1813, 1816 n. 3, 23 L.Ed.2d 396 (1969) ("This material should have appeared in the petition for removal. However, for purposes of this review it is proper to treat the removal petition as if it had been amended to include the relevant information contained in the later-filed affidavits. *See* 28 U.S.C. § 1653."). Other courts more recently have allowed consideration of facts contained in later-filed affidavits, treating those facts as an amendment of the notice of removal under section 1653.... [T]his approach is consistent with 28 U.S.C. § 1446(a), which, borrowing language from the liberal

■ The standard for determining whether a matter is related to a bankruptcy case is well established:

> The Court of Appeals for the Sixth Circuit follows the test for determining "related to" jurisdiction that was enunciated in *Pacor, Inc. v. Higgins (In re Pacor)*, 743 F.2d 984 (3d Cir.1984):
>
> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate. [*Michigan Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1142 (6th Cir.1991)] (quoting

*Pacor*, 743 F.2d at 994). The Sixth Circuit, however, applies *Pacor's* conceivable-effect test with some caution and states that even an "extremely tenuous connection" to the debtor's estate may not satisfy the related-to jurisdictional requirement. *See id. See also Merigian v. Heller Fin., Inc. (In re Sanders Confectionery Prods., Inc.)*, 973 F.2d 474, 482 (6th Cir.1992) (citing *Wolverine Radio*, 930 F.2d at 1142). And even though common issues of fact exist between a civil proceeding and a controversy involving a bankruptcy estate, a proceeding does not necessarily fall within the scope of a court's section 1334(b) jurisdiction. "Judicial economy itself does not justify federal jurisdiction." *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 789 (11th Cir.1990) (citing *Pacor*, 743 F.2d at 994).

*Rhiel v. Cent. Mortg. Co. (In re Kebe)*, 444 B.R. 871, 876 (Bankr.S.D.Ohio 2011).

■ In a Chapter 11 case in which the bankruptcy estate ceases to exist after

pleading standard of Fed.R.Civ.P. 8(a), was amended in 1988 to require only a "short and plain statement of the grounds for removal." *See* Charles Alan Wright et al., 14C Federal Practice and Procedure § 3733, at 351–56 (3d ed. 1998) (describing the amendment of section 1446(a) and stating: "[T]he better rule is that detailed grounds for removal need not be set forth in the notice. Rather, it should be sufficient if the court is provided the facts from which removal jurisdiction can be determined. Thus, the same liberal rules employed in testing the sufficiency of a pleading should apply to appraising the sufficiency of a defendant's notice of removal[.]" ... Accordingly ... we are satisfied that sections 1446(a) and 1653, together with the Supreme Court's opinion in *Willingham*, permit a court to consider jurisdictional facts contained in later-filed affidavits as amendments to the removal petition where, as here, those facts merely clarify (or correct technical deficiencies in) the allegations already contained in the original notice.); *May v. Lakeland Reg'l Med. Ctr.*, 2010 WL 376088, at *3 (M.D.Fla. Jan. 25,

2010) ("Plaintiff's Motion to Remand argues that this Court should only consider the allegations contained in the Complaint and LRMC's Notice of Removal. However, the Court finds that it is not confined to the four corners of the Complaint in addressing a Motion to Remand as it is in addressing a Motion to Dismiss. While it is undoubtedly best to include all relevant evidence in the petition for removal and motion to remand, there is no good reason to keep a district court from eliciting or reviewing evidence outside the removal petition. However, under any manner of proof, the jurisdictional facts that support removal must be judged at the time of the removal, and any post-petition affidavits are allowable only if relevant to that period of time." (citations and internal quotation marks omitted)); *Leys v. Lowe's Home Ctrs., Inc.*, 601 F.Supp.2d 908, 909 n. 2 (W.D.Mich.2009) ("[T]he court will afford the defendant an opportunity to submit now the allegations and supporting evidence that it could and should have submitted with its notice of removal.").

confirmation of the Chapter 11 plan,[35] the conceivable-effect test for determining related-to jurisdiction "becomes difficult to apply and may unduly restrict bankruptcy court jurisdiction." *Thickstun Bros. Equip. Co. v. Encompass Servs. Corp. (In re Thickstun Bros. Equip. Co.)*, 344 B.R. 515, 521 (6th Cir. BAP 2006). "Recognizing these problems, other circuit and bankruptcy courts have modified or limited the [related-to] test when the proceeding arises post-confirmation." *Id.* "[T]he essential inquiry [in the post-confirmation context where the estate does not continue in existence] appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter.... [M]atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* (citations and internal quotation marks omitted). Where, as here, the Estate continues to exist after confirmation, the problems referenced in *Thickstun* do not arise, and the conceivable-effect standard continues to apply.

■ Applying this standard, Meritage repeatedly argues that the State Court Action could not conceivably have any effect on the Estate because the Estate "is a legal fiction." Meritage Supplemental

Post–Hearing Br. at 1, 4, 5, 6. This argument is unavailing for several reasons. First, the argument is inconsistent with the express provisions of the Plan and the Confirmation Order, which clearly provide for the continued existence of the Estate. Second, none of the six issues on appeal seeks to overturn those provisions of the Plan and the Confirmation Order. Third, the Stipulated Chart—to which Meritage agreed—states that the Plan provides that the Estate continues to exist after the Effective Date, and Meritage may not at this point disavow that stipulation. *See Christian Legal Soc. v. Martinez*, —— U.S. ——, 130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010) ("This Court has ... refused to consider a party's argument that contradicted a joint stipulation [entered] at the outset of th[e] litigation.... [F]actual stipulations are formal concessions ... that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission ... is conclusive in the case." (internal quotation marks and citation omitted)). For all of these reasons, the Court must reject Meritage's arguments based on the alleged non-existence of the Estate.[36]

■ Meritage also relies heavily on the fact that the "State Court Action is a

---

35. *See* 11 U.S.C. § 1141(b) ("Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.").

36. Meritage's view regarding the reason for the continued existence of the Estate (that "[i]t is only when considered against the backdrop of the present dispute—whether 'related to' jurisdiction exists—that such bizarre and inexplicable actions may have meaning") is not relevant to the issue of whether the outcome of the State Court Action could conceivably have an effect on the Estate. Furthermore, Meritage's assessment

is not persuasive. Notwithstanding Meritage's suggestion to the contrary, it appears that the Estate remained in existence and retained the claims against Meritage under the Operating Agreement (rather than purporting to assign the claims to Inspirada Builders) out of concerns raised by the Focus Arbitration—in which, as described above, the arbitration panel held that a third party lacked standing to bring claims on behalf of South Edge. Indeed, it could be argued that the outcome of the State Court Action could conceivably have had an effect on the Estate for a reason in addition to the one propounded by JPMorgan and discussed below.

dispute between two nondebtor parties," Meritage Supplemental Post–Hearing Br. at 1, but that argument will not carry the day if the State Court Action could conceivably have an effect on the Estate. *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 585–87 (5th Cir. 1999) (holding that a claim between two nondebtors could, under certain circumstances, "produce[ ] an effect on the estate sufficient to confer 'related to' jurisdiction"); *Sanders Confectionery Prods.*, 973 F.2d at 483 ("Generally, bankruptcy jurisdiction does not extend to actions between third parties because the action would not be 'related to' a bankruptcy proceeding. For example, a bankruptcy court would not hear a case between two creditors based on their prior dealings independent of the debtor. In contrast, as detailed above, if this case had been brought during the bankruptcy proceedings it would have affected the bankruptcy estate.").

For the reasons explained below, the Court concludes that both on the Removal Date and as of the present time the outcome of the State Court Action could conceivably have an effect on the Estate. In analyzing why this is so, it is helpful to keep in mind the nature of a bankruptcy estate and the ways in which a proceeding may affect it. An " 'estate' is created at the commencement of the bankruptcy case, and is 'comprised' of, *inter alia*, 'all legal and equitable interests of the debtor in property as of the commencement of the case[.]' 11 U.S.C. § 541(a), (a)(1)." *Kellogg v. United States (In re W. Tex. Mktg. Corp.)*, 54 F.3d 1194, 1200 (5th Cir.1995). *See also Reliance Ins. Co. of Ill. v. Weis*, 148 B.R. 575, 581 (E.D.Mo.1992) ("The bankruptcy estate is created upon the filing of the petition for bankruptcy.... Section 541 of the Code establishes that the filing of the bankruptcy petition creates an estate and defines which property comprises the estate. Subsection 541(a)(1) defines

property of the estate as 'all legal or equitable interests of the debtor in property as of the commencement of the case.' This includes all choses in action and claims by the debtor against others." (citations omitted)). Whether a creditor will receive a recovery on its claim from a bankruptcy estate—and the extent of that recovery— will generally turn on two factors: the value of the assets comprising the estate and the amount of allowed claims asserted against it.

Given that a bankruptcy estate is comprised of property and that claims can be brought against the estate, a state court proceeding could conceivably have an effect on an estate in at least three ways that are relevant here. First, a proceeding could conceivably have an effect on an estate if it could potentially decrease the amount of claims against the estate. As explained below, this clearly was true of the State Court Action on the Removal Date. Second, a proceeding could conceivably have an effect on a bankruptcy estate if it could potentially decrease the value of property of the estate. That effect also was conceivable on the Removal Date—which is relevant to the issue of whether the State Court Action was properly removed—and also continues to be conceivable today, which is relevant to the issue of whether the State Court Action should be transferred or remanded. Also relevant to the transfer and remand issue is the fact that the outcome of the State Court Action could, as explained below, potentially increase the amount of claims against the Estate.

### 1. The Conceivable Effect of Decreasing the Amount of Claims Against the Estate

██ JP Morgan contends that the State Court Action was related to the South Edge Bankruptcy Case on the Re-

moval Date because, if Meritage were found liable on the Repayment Guaranty, this conceivably could have resulted in reducing the Lenders' claims against the Estate. Meritage argues that this is not so given the structure of the Plan: prior to confirmation, a payment by Meritage could have reduced the amount of the Lenders' claims (in the aggregate amount of approximately $382 million) to approximately $369 million, but that is still more than the $335 million that the Lenders agreed to receive in exchange for their claims being deemed fully satisfied. In its reply brief, Meritage points out that, after confirmation, any recovery by JPMorgan on the Repayment Guaranty would inure to the benefit of the Settling Builders, not to the Lenders:

> JPMorgan incorrectly states that if Meritage is successful in the State Court Action, South Edge will be burdened by additional liabilities.... Perhaps in a different case, JPMorgan's position would be worthy of consideration. However, in the factual context of this case, JPMorgan's position is wholly without merit.... The Plan provides that the Settling Builders will pay JPMorgan and the other members of the lending group $335 million on their secured claim, with the remaining amount of approximately $47 million being treated as an unsecured claim. The unsecured deficiency claims of the lenders is satisfied by each lender receiving its pro rata share of $500,000. Accordingly, pursuant to the Plan, the lenders will hold no further claims against South Edge. In addition, the Settling Builders will fund an escrow equal to the amount alleged to be due from Meritage pursuant to the Repayment Guaranty. The Plan provides that each of the lenders has the option of taking its pro rata share from the escrow or retaining its claims against Meritage.... The Settling Builders receive from each lender exercising the option, the participant share of such lender in the escrow....

Meritage Reply at 4–5.

■ All that is true, but it ignores the fact that, as of the Removal Date, confirmation of the Plan was not a foregone conclusion. On the Removal Date, in fact, the Plan had not yet been confirmed, and Meritage was strenuously opposing confirmation on multiple grounds, including alleging a lack of good faith on the part of the proponents of the Plan. Although the Plan was later confirmed, as of the Removal Date it certainly was conceivable that it would not be. And if the Plan had not been confirmed, it is conceivable that the settlement under which the Lenders agreed to accept less than the full amount owed them in full satisfaction of their claims would have been in jeopardy. Under that scenario—which was certainly conceivable as of the Removal Date—a payment by Meritage under the Repayment Guaranty conceivably could have reduced the amount of the Lenders' claim against the Estate. And it is well established that an action that could result in a reduction of claims against the estate gives rise to the type of conceivable effect on the estate required to support a finding of related-to jurisdiction. *See Mich. Tractor & Mach. Co. v. Red Top Rentals, Inc. (In re Red Top Rentals, Inc.)*, 2010 WL 2737182, at *3 (Bankr.E.D.Mich. Jan.11, 2010) ("To the extent that MCAT recovers against Dowden, it will reduce MCAT's claim against the assets of the bankruptcy estate. Thus, an action by MCAT to enforce the guaranty 'could conceivably' affect the Debtor's estate and 'related to' jurisdiction exists."); *Joremi Enters., Inc. v. Hershkowitz (In re New 118th LLC)*, 396 B.R. 885, 890–91 (Bankr.S.D.N.Y.2008) ("[G]uarantee claims are considered to be 'related to' the bankruptcy case.... [I]f

the creditor recovers from the guarantor, the creditor's claim against the estate will be reduced or eliminated. . . ."); *Equimark Commercial Fin. Co. v. Novachich (In re Showcase Natural Casing Co.)*, 54 B.R. 142, 144 (Bankr.S.D.Ohio 1985) ("We therefore have no doubt that the present suit is within the jurisdiction conferred by Congress on the district court in bankruptcy matters. Here, the requisite relationship is to be found because if there is a holding of liability against defendants on their guaranty, this will necessarily reduce plaintiff's claim against the debtor.").

And that could have been the effect on the Estate here as of the Removal Date. In the State . Court Action, Meritage is seeking a declaratory judgment that it is not legally required to take the action—make payments on the Repayment Guaranty—that as of the Removal Date (before confirmation of the Plan) conceivably could have resulted in the reduction of the Lenders' claims against the Estate.

To be clear, a recovery by a creditor against a nondebtor guarantor will not necessarily have a conceivable effect on the estate in all, or even most, bankruptcy cases. The Court need not and therefore does not address generally the question of when a lawsuit between a lender and a nondebtor guarantor that could result in the guarantor's payment on the guaranty will have a conceivable effect on a bankruptcy estate. Indeed, an argument could be made in many bankruptcy cases that a reduction or elimination of the lender's claim would have no effect on the estate because there would be a concomitant increase in the amount of claims against the estate based on the rights of subrogation, reimbursement and/or indemnification asserted by the guarantor, the result being a mere substitution of creditors. *See Boyer v. Simon (In re Fort Wayne Telsat, Inc.)*, 403 B.R. 590, 596 (Bankr.N.D.Ind.2009)

("[A] guarantor's payment of a debtor's obligation to a creditor does not affect the total amount of claims against the estate. Instead, it simply substitutes one creditor, the guarantor, for another, the original claimant. The total debt to be paid by the estate remains the same and, therefore, so does the distribution to the debtor's other creditors.").

Here, however, it was conceivable on the Removal Date that Meritage would have been unsuccessful in asserting rights such as subrogation and indemnification. First, the Repayment Guaranty expressly restricts Meritage's right of subrogation. It states as follows:

> Except as otherwise provided in this Section 6, the Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until all the Secured Obligations have been paid in full and the Facilities are no longer in effect. Upon termination of this Guaranty under the provisions of Section 2(c) hereof, Guarantor shall be subrogated (and shall succeed) to the Administrative Agent's Lien against the portion of the Project provided to be purchased by the Member Guarantor under its Acquisition Agreement but without impairment of the Administrative Agent's Lien in and to the balance of the Project or any other Collateral. To the extent of any such subrogation, the Administrative Agent shall, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the Guarantor's rights resulting from its subrogation and succession to the Lien of the Administrative Agent on such portion of the Project. If any amount is paid to the Guarantor on account of subrogation rights at law or

under this Guaranty at any time when all the Liabilities have not been paid in full, the amount shall be held in trust for the benefit of the Administrative Agent and shall be promptly paid to the Administrative Agent to be credited and applied to the Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Facilities.

Repayment Guaranty § 6. Second, given Meritage's alleged breaches of the Operating Agreement, it was conceivable as of the Removal Date that the Estate would have had defenses to Meritage's indemnification claim. Because the Estate would not have had those same defenses against the claims of the Lenders, the effect of Meritage's being found liable on the Repayment Guaranty would not have been a mere substitution of creditors, a finding that also supports related-to jurisdiction here. *See New 118th LLC,* 396 B.R. at 891 (" '[R]elated to' jurisdiction has ... been found where the guaranty action will not necessarily result in a mere substitution of creditors. The reimbursement claim may stand on a different footing because it is for a different amount, or the debtor can assert defenses against the guarantor that it cannot assert against the common creditor."); *Burns v. First Citizens Bank & Trust Co. (In re Rainbow Sec. Inc.),* 173 B.R. 508, 511–12 (Bankr.M.D.N.C.1994) (holding that creditor's actions against nondebtor third parties was related to the debtor's bankruptcy case where "the estate might very well have defenses against the third-party defendants, as officers, shareholders and insiders of the debtor corporation, which it would not have if First Citizens were the creditor"). *Cf. Canion,* 196 F.3d at 585–86 (holding that

creditor's action against nondebtor third parties was related to the bankruptcy case because, if the creditor succeeded, "the total amounts due on claims against [the debtor's] bankruptcy estate would be decreased," and the debtor might have a defense of unclean hands to the third parties' reimbursement claims). Thus, a determination that Meritage had breached the Operating Agreement was a distinct possibility on the Removal Date—potentially blocking a recovery by Meritage on its claims for indemnification or reimbursement. Accordingly, a finding in the State Court Action that Meritage was liable on the Repayment Guaranty could conceivably have had the effect, as of the Removal Date, of decreasing the amount of claims against the Estate.

 Meritage argues that the State Court Action could not conceivably have had an effect on the Estate on the Removal Date because JPMorgan did not file its counterclaim—which is the only claim asserted in the State Court Action that would result in a payment by Meritage on the Repayment Guaranty—until after the Removal Date. This argument is unavailing. JPMorgan commenced the Nevada Repayment Guaranty Action, which is substantially identical to JPMorgan's counterclaim, before the Removal Date, and on that date it therefore was conceivable, if not inevitable, that JPMorgan would file a counterclaim seeking to hold Meritage liable for its alleged breaches of the Repayment Guaranty. Consequently, the fact that JPMorgan did not file the counterclaim until after the Removal Date provides no basis for finding that the State Court Action could not conceivably have had an effect on the Estate based on facts existing on the Removal Date.[37] Equally

---

**37.** Whether or not any of this was evident from the State Court Complaint is irrelevant given that the well-pleaded complaint rule for

determining federal jurisdiction does not apply in the context of related-to jurisdiction. *See, e.g., Robinson v. Michigan Consol. Gas*

unpersuasive is Meritage's argument that the State Court Action could have no conceivable effect on the Estate because the Estate was already insolvent on the Removal Date, and a reduction in the amount of the claims would merely make it less insolvent. *See* Tr. at 20:15–21:4. Meritage provides no authority for this proposition, and the Court finds that, as of the Removal Date—which occurred prior to confirmation of the Plan—a reduction in insolvency could conceivably have affected the Estate.

### 2. The Conceivable Effect on Property of the Estate

■ "Section 1141(b) allows a debtor or a court to prevent or postpone the transfer of property of the estate to the new post[ ]confirmation entity by providing that assets do not vest in the reorganized entity or they vest after a delay or with qualifications." *In re WorldCom, Inc.*, 2009 WL 2959457, at *2 (Bankr.S.D.N.Y. May 19, 2009) (internal quotation marks omitted). "When that occurs, assets remain 'property of the estate' subject to the jurisdiction of the bankruptcy court and the dictates of the Bankruptcy Code." *Id.* The Plan and Confirmation Order make it abundantly clear, that this was the approach taken in the South Edge Bankruptcy Case. The Estate's claims against Meritage under the Operating Agreement remained property of the Estate after confirmation.

■ Those claims have value. But any recovery that might be obtained by JPMorgan on the Repayment Guaranty on behalf of the Settling Builders in the State Court Action could conceivably reduce that value, which would constitute an effect on the Estate. *See Willis v. Litzler (In re TIC United Corp.)*, 194 Fed.Appx. 187, 188 (5th Cir.2006) ("Willis argues that the bankruptcy court lacked subject matter jurisdiction. We disagree. Willis' state court lawsuit was related to the bankruptcy case because the outcome of that proceeding could conceivably have [an] effect on the estate being administered in bankruptcy. Willis' state law tort claims can affect the debtor's bankruptcy estate by decreasing the amount of ... assets ... [available to the estate]" (internal quotation marks omitted)). As the Stipulated Chart demonstrates, to the extent that (1) Meritage is determined to have liability on the Repayment Guaranty and (2) the Meritage Proof of Claim is allowed, Meritage could conceivably utilize its indemnification rights asserted in that proof of claim to effectuate a setoff against any liability that Meritage is determined to have to the Estate under the Operating Agreement. Because the outcome of the State Court Action could result in Meritage asserting a setoff that in turn might reduce the value of property of the Estate (*i.e.*, the Estate's claims against Meritage under the Operating Agreement), the State Court Action could conceivably have an effect on the Estate. This potential effect on the Estate existed on the Removal Date because, as of that date, the Plan provided that the Settling Builders could elect to leave the Estate's claim against Meritage under the Operating Agreement in the Estate, and the potential effect continues as of the present time because the Settling Builders in fact made that very election.

Meritage argues that it is not quite that simple, but the complexity that Meritage

---

Co., 918 F.2d 579, 585 n. 4 (6th Cir.1990); *McIntyre Land v. McIntyre Bldg. Co. (In re McIntyre Bldg. Co.)*, 2011 WL 1434691, at *11–12 (Bankr.M.D.Ala. Apr. 14, 2011) (discussing split of authority on the issue of whether the well-pleaded complaint rule applies in the context of bankruptcy jurisdiction under § 1334 and holding that the rule does not apply). In fact, Meritage does not argue that the rule applies.

interjects serves to demonstrate only that the outcome of the State Court Action might not have an effect on the Estate. The issues raised by Meritage do not, however, negate the fact that the outcome of the State Court Action could *conceivably* have an effect on the Estate. And the "key word in [the conceivable-effect test] is conceivable." *Halper v. Halper,* 164 F.3d 830, 837 (3d Cir.1999). "Certainty, or even likelihood, is not a requirement." *Id. See also Wolverine Radio,* 930 F.2d at 1143 ("Although we acknowledge the possibility that the MESC–JOSI dispute may ultimately have no effect on the debtor, we cannot conclude that it will have no *conceivable* effect. Accordingly, we find that subject matter jurisdiction exists in the bankruptcy court over the MESC–JOSI dispute.").

In the Meritage Supplemental Post–Hearing Brief, Meritage identifies nine contingencies that it argues "must be resolved before any impact upon [the] Estate [that its setoff rights might have] can be considered 'conceivable[.]'" Meritage Supplemental Post–Hearing Br. at 9. In the Court's view, certain of those contingencies need not occur in order for Meritage's potential setoff rights to cause the State Court Action to conceivably have an effect on the Estate, and each of the other contingencies either has already occurred or conceivably could occur.

The Court will first address the two contingencies that need not occur in order for the State Court Action to conceivably have an effect on the Estate based on Meritage's potential setoff rights—(1) that "Meritage must win its pending appeal as to the Third Issue on Appeal" [38] and (2) that "Meritage's valid setoff claim must impair the Estate's ability to pay claims as required by the Plan." *Id.*

As to the first of those contingencies, Meritage argues that, even if the State Court Action resulted in a ruling that it was liable to JPMorgan on the Repayment Guaranty, and even if Meritage then sought to assert its indemnification claim as a setoff against any liability it is determined to have to the Estate under the Operating Agreement, the Plan would prohibit Meritage from effectuating a setoff unless it first prevailed on the Third Issue on Appeal. This argument, however, is inconsistent with the language of the Plan. As set forth above, nothing in § 8.3 of the Plan would prohibit Meritage from defensively asserting claims that are allowed by another Plan provision or the Confirmation Order. And Meritage's indemnity claim may become an allowed claim under the terms of the Plan for setoff purposes because the Plan defines "Secured Claims" to include claims for setoff under § 553 of the Bankruptcy Code; and under the Plan allowed setoff claims are classified as "Class S1—Other Secured Claims." As also discussed above, during the hearing on confirmation of the Plan, the Nevada Bankruptcy Court inquired of counsel for the Settling Builders regarding the concern that the Plan would prohibit Meritage from asserting setoff rights. The Nevada Bankruptcy Court, apparently satisfied with the explanation provided, overruled Meritage's objections to the Plan and entered the Confirmation Order. The Court thus concludes that Meritage's right to assert its indemnification claim as a setoff against any recovery by the Estate is not dependent on the disposition of the Third Issue on Appeal.

---

**38.** As previously stated, the Third Issue on Appeal is "[w]hether the [Nevada] Bankruptcy Court erred by approving a post-confirmation injunction in favor of a liquidating debtor that retains claims against Meritage, and its successors, enjoining Meritage from asserting, inter alia, 'rights ... based upon any act ... that occurred prior to the Effective Date.'"

■ Likewise, Meritage incorrectly argues that, in order for the outcome of the State Court Action to conceivably have an effect on the Estate, any setoff must impair the Estate's ability to pay claims under the Plan. This argument conflates claims against the Estate with the Estate itself. Yet, as discussed above, a bankruptcy estate may be affected not only by the allowance or disallowance of claims against it, but also by matters that affect the extent and value of the property comprising the estate, including the claims it holds against others. *See Kellogg*, 54 F.3d at 1200; *Reliance Ins. Co.*, 148 B.R. at 581. Meritage contends that the State Court Action could not conceivably have any effect on the Estate because most of the claims against the Estate have already been paid, the rest might be paid with funds provided by the Settling Builders, and the Settling Builders remain responsible for funding payments on claims against the Estate, with any residual value of the Estate to be paid to Inspirada Builders, which is owned by the Settling Builders. The Court could accept all that as a basis for finding a lack of relatedness only if the Court were to find the Estate, as well as the property held by it, to be a legal fiction. For reasons already explained, the Court cannot do so.

Next, there is the contingency that has already come to pass—"[T]he Estate Representative must identify a litigation claim against Meritage." Meritage Supplemental Post–Hearing Br. at 9. The Estate Representative did so in the Arbitration Motion and in the Arbitration Demand.

The Court turns to the contingencies posited by Meritage that indeed must occur in order for the State Court Action to have an effect on the Estate. As explained below, each of those contingencies could conceivably occur. Indeed, a close analysis of those contingencies provides a roadmap for demonstrating in even greater detail how the outcome of the State Court Action could conceivably have an effect on the Estate.

Meritage first contends that it "must lose at least its declaratory judgment claims [under the Repayment Guaranty] in the State Court Action[,]" and "JPMorgan must prevail on its counterclaim [under the Repayment Guaranty] in the State Court Action[,]" *id.*, in order for the State Court Action to conceivably have an effect on the Estate. It is not this Court's role to adjudicate the merits of the State Court Action. Rather, the Court is tasked only with determining whether it is conceivable that JPMorgan could obtain a judgment against Meritage on the Repayment Guaranty. The Court finds that it is conceivable that JPMorgan could obtain such a judgment. JPMorgan contends that a "Bankruptcy Event" occurred, thereby triggering Meritage's liability under the Repayment Guaranty. Meritage requests a declaratory judgment that JPMorgan has no rights against Meritage under the Repayment Guaranty, alleging that (1) Meritage tendered full payment to JPMorgan in April 2008, (2) JPMorgan wrongfully refused to accept Meritage's payment and refused to issue a partial lien release and (3) a Bankruptcy Event as defined in the Repayment Guaranty was not intended to include an involuntary bankruptcy initiated by JPMorgan. As to the first two allegations, the rulings of the Nevada Federal District Court regarding the effect of the release set forth in the Forbearance Agreement persuade the Court to conclude that JPMorgan conceivably could prevail under the Repayment Guaranty. As to the third allegation, it bears noting that the term Bankruptcy Event was defined in the Repayment Guaranty to include an involuntary bankruptcy in which an order for relief was entered, which is what happened in the South Edge Bankruptcy

Case. And an involuntary filing by JPMorgan was not expressly excluded from the definition of "Bankruptcy Event" contained in the Repayment Guaranty. On the other hand, it is conceivable that Meritage will be found not to have any liability on the Repayment Guaranty. After all, the Nevada Federal District Court did not rule on the effect of the releases set forth in the Forbearance Agreement on affirmative defenses, and no court has, as far as the parties have made this Court aware, ruled on whether the term Bankruptcy Event should have included an involuntary bankruptcy petition filed by JPMorgan. But for purposes of the relatedness analysis the possibility that Meritage might prevail on the Repayment Guaranty is not outcome determinative. All that JPMorgan need establish is that it is conceivable that JPMorgan could prevail on the Repayment Guaranty. It has done so.

Continuing down this road, Meritage argues that it "must either lose its breach of contract claim for damages against JPMorgan, or any award on such claim must not serve to offset JPMorgan's prevailing counterclaim award...." Meritage Supplemental Post–Hearing Br. at 9. True, but it is conceivable that Meritage could lose on its breach of contract claim, which is largely predicated on the same allegations that form the basis of its declaratory judgment claims.

Meritage also argues that the Estate Representative must "successfully prosecute a litigation claim against Meritage" under the Operating Agreement, *id.*, in order for there to be a conceivable effect on the Estate. As with the State Court Action, it is not this Court's role to adjudicate the Estate Representative's claims against Meritage under the Operating Agreement. But in light of the Focus Arbitration—in which the arbitration panel found Meritage liable for certain breaches of the Operating Agreement—it is certainly conceivable that the Estate Representative could obtain a judgment against Meritage based on the Operating Agreement. *See also* Nelson Decl. at 3 (stating that, "[w]hile [Nelson] believe[d] that the Estate has a strong case against the Settling Builders and Meritage.... [she understood] that the potential damage awards to the Estate based upon those claims could vary widely from a net zero in damages to in excess of $500 million in damages...."). Thus, once again, JPMorgan has carried its burden of demonstrating that the State Court Action could conceivably impact the Estate.

Finally, Meritage contends that, in order for the State Court Action to conceivably have an effect on the Estate, its indemnification claim (1) "must be valid and not subject to any successful objection" and (2) "must meet the test for a valid setoff...." Meritage Supplemental Post–Hearing Br. at 9. As discussed above in the context of the potential reduction of claims against the Estate that the State Court Action could cause, it is conceivable that Meritage's indemnification claim, even if asserted only as a setoff, will be subject to valid defenses, especially if Meritage is found to be liable to the Estate for breaches of the Operating Agreement. In fact, JPMorgan itself argued at one point in these proceedings that Meritage "provides no evidence that it could recover from South Edge for funds it might have to pay to JPMorgan under the Repayment Guaranty" and "[n]or can it because Meritage is one of the equity owners of South Edge, not a separate and unrelated entity." JPMorgan Opp'n at 11–12. And the Estate Representative presumably will challenge Meritage's asserted right to indemnification on that basis either by objecting to the Meritage Proof of Claim in the South Edge Bankruptcy Case or, if the Nevada Bankruptcy Court grants its request to compel

arbitration, as part of the arbitration proceedings. But it also is conceivable that this argument will be rejected and that Meritage's indemnification claim will, at least in part, be found valid and will meet the requirements for a valid setoff. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* 2005 WL 1026559, at *5 (S.D.N.Y. May 2, 2005) (holding that the existence of potential reasons for disallowing the indemnification claims that formed the basis for related-to jurisdiction did not mean that such jurisdiction was lacking because "indemnification claims against Adelphia are to be litigated ultimately in, presumably, the bankruptcy court"). The only argument that Meritage itself even suggests to the contrary is that "with respect to indemnity claims related to the Repayment Guaranty, a court would have to determine whether mutuality existed on the petition date." *See* Meritage Supplemental Post–Hearing Br. at 5 n. 9. The mutuality requirement arises from § 553(a) of the Bankruptcy Code, which provides in pertinent part that, with certain exceptions not applicable here, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . ." 11 U.S.C. § 553(a). Substitute "Meritage" for "a creditor" and "South Edge" for "the debtor," and there is no apparent reason why the mutuality requirement would not be met if Meritage were to seek to set off any debt it owes under the Operating Agreement to South Edge (now the Estate) against any allowed indemnification claim it might hold against the Estate.

In the final analysis, both on the Removal Date and as of the present time, the outcome of the State Court Action could conceivably have an effect on the Estate by (1) increasing the amount of claims against the Estate and (2) decreasing the value of claims held by the Estate. The State Court Action, therefore, is related to the South Edge Bankruptcy Case.

### 3. The Conceivable Effect on Claims Against the Estate

■ The Court finds that the State Court Action continues to be related to the South Edge Bankruptcy Case as of the present time because the outcome of the State Court Action could conceivably increase the amount of claims against the Estate. If Meritage was determined to have liability on the Repayment Guaranty in the State Court Action it might—if it also prevailed on the Third Issue on Appeal—assert an affirmative indemnification claim against the Estate. And, as of the present time, the amount of the claims held by JPMorgan and the other Lenders has been fixed by the provisions of the Plan, which has been confirmed. In fact, as of the present time, a recovery by JPMorgan in the State Court Action would inure to the benefit of the Settling Builders and would not result in a reduction of the Lenders' claims against the Estate. Thus, if Meritage successfully asserted an indemnification claim against the Estate affirmatively rather than as a setoff, this would increase the amount of claims against the Estate. And the Sixth Circuit has held that related-to jurisdiction exists over litigation between third parties that might increase the claims against the estate by means of indemnification. *See Dow Corning,* 86 F.3d at 492–94; *Wolverine Radio Co.,* 930 F.2d at 1143 (holding that an indemnification provision supported jurisdiction even though the debtor "would not be affected until and unless [the third party] invoked the indemnification" provision and that it would "not require a finding of definite liability of the

estate as a condition precedent to holding an action related to a bankruptcy proceeding."). *See also In re FairPoint Commc'ns, Inc.,* 452 B.R. 21, (S.D.N.Y. 2011) ("In *In re El Paso Refinery, LP,* 302 F.3d 343, 349 (5th Cir.2002), the Fifth Circuit found bankruptcy court jurisdiction to enjoin third party litigation that would set off a 'chain of indemnification provisions ... leading directly to the [d]ebtor.' The Sixth Circuit reached the same result in *In re Wolverine Radio Co.,* 930 F.2d 1132, 1143 (6th Cir.1991))."; *Adelphia Commc'ns,* 2005 WL 1026559, at *5 ("[J]urisdiction over a third party action exists where a claim for indemnification or contribution arising from that litigation has a conceivable effect on a bankruptcy proceeding. That a further action (or adversary proceeding) may be required for the Rigas Defendants to realize on a claim for indemnification against Adelphia does not eliminate related to jurisdiction. There need only be (if so much) a reasonable basis for a claim against the estate....").

Unlike its ability to assert a setoff, Meritage would be able to assert an affirmative indemnification claim only if it prevailed on the Third Issue on Appeal. The only position the Court takes in this regard is that it is conceivable that Meritage could prevail on the Third Issue on Appeal. Even if the Court were to consider that eventuality unlikely—an issue it need not reach—

that would be of no moment because "[c]ertainty, or even likelihood, is not a requirement" for a finding of relatedness. *Halper,* 164 F.3d at 837.

## B. The Relative Merits of Transfer and Equitable Remand/Permissive Abstention

■ The Court turns next to the issue of whether the State Court Action should be transferred to the Nevada Federal District Court or remanded to the Ohio State Court. The party seeking transfer, here JPMorgan, has the burden of demonstrating that the proceeding should be transferred. *See Levy v. Cain, Watters & Assoc., PLLC,* 2010 WL 271300, at *9 (S.D.Ohio Jan. 15, 2010).

■ The section of the Judicial Code under which JPMorgan seeks a transfer of the State Court Action, 28 U.S.C. § 1412, provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." Similarly, under 28 U.S.C. § 1404, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404.[39]

---

**39.** There is a split of authority on the issue of whether § 1412 applies only to core proceedings (which the State Court Action is not), with 28 U.S.C. § 1404(a) instead applying to non-core matters. *See Dunlap v. Friedman's Inc.,* 331 B.R. 674, 677 (S.D.W.Va.2005) (citing cases on both sides of the issue); *Bavelis,* 453 B.R. at 873 n. 26. Meritage contends that § 1404(a) applies and that JPMorgan therefore is seeking transfer under the wrong statutory provision. The Court, though, need not decide the issue. Although there are differences between the two provisions— § 1404(a) refers to witnesses, § 1412 does not; § 1412 is clearly written in the disjunctive, § 1404(a)

is not; and only § 1404(a) requires that the court to which the transfer is made be one in which the action originally could have been commenced—here the result under both sections is the same given that (1) there is no dispute that the State Court Action could have been commenced in the Nevada Federal District and (2) the interest of justice and convenience both support transfer. The applicable section under which transfer is sought therefore does not matter. *See Quicksilver Res. Inc. v. Eagle Drilling, LLC,* 2010 WL 1633348, at *4 (S.D.Tex.2010) ("The application of 28 U.S.C. 1404(a) instead of 28 U.S.C. 1412 is a

In analyzing whether a transfer would be in the interest of justice, courts typically weigh (1) whether a transfer would promote the economic and efficient administration of the bankruptcy estate, (2) whether the interests of judicial economy would be served by the · transfer, (3) whether the parties would be able to receive a fair trial in each of the possible venues, (4) whether either forum has an interest in having the controversy decided within its borders, (5) whether the enforceability of any judgment would be affected by the transfer and (6) whether the plaintiff's original choice of forum should be disturbed. *See Bavelis,* 453 B.R. at 874.

In analyzing the convenience prong courts have considered the (1) location of the plaintiff and defendant, (2) ease of access to the necessary proof, (3) convenience of the witnesses and the parties and their relative physical and financial condition, (4) availability of the subpoena power for unwilling witnesses and (5) expense of obtaining unwilling witnesses. *See id.* at 841.

The Court concludes that, on balance, the factors to be analyzed under the transfer statutes (both the interest of justice and the convenience prongs) weigh in favor of transferring the State Court Action to the Nevada Federal District Court.

As explained in detail below, the primary considerations leading to this conclusion are (1) the continued existence of the Estate, (2) the effect that the State Court Action could have on the Estate, (3) the pendency of the South Edge Bankruptcy Case (to which the State Court Action is related) in Nevada and (4) the participation of JPMorgan and Meritage in the appeal of the Confirmation Order, which is pending in the Nevada Federal District Court.

### 1. The Interest of Justice

"In deciding whether the transfer of an adversary proceeding would be in the interest of justice, courts give the greatest weight to whether the proposed transfer would promote the economic and efficient administration of the bankruptcy estate." *Bavelis,* 453 B.R. at 874. *See also Gunner v. Anthony (In re Heritage Fin. Network, Inc.),* 286 B.R. 318, 320 (Bankr.S.D.Ohio 2002) ("As for the interests of justice, nearly every case that has considered transfer of a bankruptcy proceeding has construed this phrase in section 1412 to give primacy to administrative matters affecting the estate." (internal quotation marks omitted)). It should not be surprising, then, that there is a strong

---

nonissue."); *Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.,* 408 B.R. 90, 98 n. 3 (Bankr.S.D.Tex.2009) ("Considering the nearly identical language in § 1404(a) and § 1412, courts have generally applied the same analysis to both."). Moreover, even if JPMorgan should have moved for transfer under § 1404(a), the fact that it did not do so would not prevent a transfer under that section where, as here, the Court made the parties aware of the possibility of such a transfer, *see* Tr. at 106–07, the parties had an opportunity to brief the issues relevant to such a transfer and findings relevant to the transfer under that section are made. *See Moore v. Rohm & Haas Co.,* 446 F.3d 643, 647 (6th Cir.2006). *See also Doss v. Chrysler Grp.,*

LLC, 2009 WL 4730932, *5 (D.Ariz. December 7, 2009) ("[T]he present case is 'related to' a Title 11 proceeding, but the Court has not held that it arises under Title 11.... [T]he Court has found no authority indicating how the Ninth Circuit would interpret 28 U.S.C. § 1412, [and] the Court will not transfer the case under that statute. The Court will, however, transfer this matter *sua sponte* under 28 U.S.C. § 1404."); *In re Henderson,* 197 B.R. 147, 156 (Bankr.N.D.Ala.1996) ("The vast weight of authority holds the district court may transfer civil actions sua sponte under 28 U.S.C. § 1404."). In fact, counsel to Meritage agreed that transfer sua sponte was permissible under 28 U.S.C. § 1404. *See* Tr. at 107:4–5.

presumption that a proceeding related to a bankruptcy case should be heard in the district where the bankruptcy case is pending. *See Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.),* 896 F.2d 1384, 1391 (2d Cir.1990) ("[T]he district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy."); *Dwight v. Titlemax of Tenn., Inc.,* 2010 WL 330339, at *2 (E.D.Tenn. Jan. 21, 2010) (recognizing the strong presumption in favor of venue in the district where the debtor's bankruptcy case is pending); *MD Acquisition, LLC v. Myers,* 2009 WL 466383, at *6 (S.D.Ohio Feb. 23, 2009) (same); *HLI Creditor Trust v. Keller Rigging Constr., Inc. (In re Hayes Lemmerz Int'l Inc.),* 312 B.R. 44, 46 (Bankr.D.Del.2004) (same). The pendency of the South Edge Bankruptcy Case in the District of Nevada, therefore, weighs heavily in favor of transfer.

The Court also concludes that a transfer would serve the interests of judicial economy because the Nevada Federal District Court, as well as the Nevada Bankruptcy Court, has "developed a substantial 'learning curve'" with respect to the facts and circumstances that gave rise to the State Court Action. *Manville Forest Prods. Corp.,* 896 F.2d at 1391. For example, as JPMorgan has argued, the UCC Action and the Completion Guaranty Action would—despite their dismissal (which was anticipated at the time of the Hearing) and their lack of preclusive effect—counsel in favor of transfer and against equitable remand:

> [W]e have discussed and I think are on the verge of submitting to [the Nevada Federal District Court] a stipulation of dismissal without prejudice of both the UCC [A]ction and the [C]ompletion [G]uarant[y] [A]ction as to Meritage . . . .

And that's simply a part of an effectuation of the [P]lan.

> . . . .

> What we're claiming is judicial efficiency.

> . . . .

> [T]he decisions that [the Nevada Federal District Court] reached as to which collateral estoppel doesn't attach, they are directly relevant to the claims here in the state court action. There's the scope of the good faith and fair dealing, the scope of the waiver in the [Repayment Guaranty] and the scope of the release in the [F]orbearance [A]greement. All of those things are things that he has looked at and decided. No collateral estoppel, no res judicata but it's certainly more efficient for him to revisit those.

Tr. at 89:6–91:15. As discussed above, in connection with these actions, the Nevada Federal District Court became familiar with the Repayment Guaranty and the other facts relevant to the merits of the State Court Action.

The other factors to be considered when determining whether the interest of justice warrants transfer are either neutral or weigh in favor of transfer. There is no reason to believe that the parties would be unable to receive a fair trial in either the Ohio State Court or the Nevada Federal District Court. Meritage contends that remand is appropriate because it has demanded a jury trial. Yet Meritage provides no reason why the Nevada Federal District Court could not conduct a jury trial if Meritage indeed is entitled to one, and "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In light of the fact that the South

Edge Bankruptcy Case is pending in the District of Nevada, and given that the real estate development that gave rise to the parties' disputes is located there, the District of Nevada has more of an interest in having the controversy decided within its borders than does the State of Ohio, a factor that also weighs in favor of transfer. *See JP Morgan Chase Bank, N.A. v. Coleman–Toll Ltd. P'ship,* 2009 WL 1457158, at *9 (S.D.N.Y. May 26, 2009) at 10 ("[T]he location of operative events is a primary factor in determining a motion to transfer venue.... It would be more efficient to litigate these claims in the District in which they occurred.... Indeed, when the operative facts have few meaningful connections to the plaintiff's chosen forum.... [t]he importance of the plaintiff's choice of forum measurably diminishes.... [W]here, as here, there is no material connection between this district and the operative facts ... the interests of justice require the transfer of the action." (internal quotation marks omitted)). The Court finds that the enforceability of any judgment would not be affected whether a transfer occurs or not. Finally, the Court finds that all of the foregoing provide good reasons for disturbing Meritage's choice of Ohio as the forum in which to assert its claims.

## 2. Convenience

As the United States District Court for the Southern District of New York found when transferring the Completion Guaranty Action to the Nevada Federal District Court, "it is undoubtedly inconvenient for Defendants [Meritage and the other Members] to litigate against the same adversary at the same time in separate-but related actions on opposite sides of the nation." *See JP Morgan Chase*

*Bank,* 2009 WL 1457158, at *6. *See also Capital Venture Int'l v. Network Commerce, Inc.,* 2002 WL 417246, at *2 (S.D.N.Y. Mar. 15, 2002) (holding that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal" because, among other things, it avoids wasted "time and expense for both parties" (internal quotation omitted)). So too here. JPMorgan and Meritage are litigating Meritage's appeal of the Confirmation Order against one another in the Nevada Federal District Court. Thus, although JPMorgan's main office is in Ohio,[40] the Court concludes that it would be inconvenient for JPMorgan to litigate the State Court Action with Meritage in the Ohio State Court.

Meritage relies on *Gulf Oil* for the proposition that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Meritage Resp. at 7. True, the United States Supreme Court promulgated that rule in *Gulf Oil,* but it then held that the rule did not apply in that very case where, among other things:

> The plaintiff himself is not a resident of [the state in which he seeks to litigate], nor did any event connected with the case take place there, nor does any witness with the possible exception of experts live there. No one connected with that side of the case save counsel for the plaintiff resides there.... [The arguments made on behalf of the plaintiff] are devoted to controver[t]ing claims as to defendant's inconvenience rather than to showing that the present forum serves any convenience of his own....

*Gulf Oil,* 330 U.S. at 509–10, 67 S.Ct. 839.

All that is true here as well. Neither the facts relevant to the State Court Ac-

---

**40.** Although its main office is in Ohio, JPMorgan's principal place of business is in New York. *See JPMorgan Chase Bank,* Case No. 08–10571 at 2.

tion nor Meritage itself have any connection to Ohio, with the limited exception that the attorneys it has retained to pursue this matter in this Court and the Ohio State Court are located in Ohio. As in *Gulf Oil,* Meritage attempts to demonstrate the lack of inconvenience that JPMorgan would experience by litigating in Ohio rather than showing how Ohio serves Meritage's own convenience. Meritage has not set forth anything suggesting that it would unduly inconvenience Meritage to litigate this matter in the Nevada Federal District Court.

What is more, given that Meritage sought and obtained transfer of the Completion Guaranty Action to the Nevada Federal District Court, "the court can hardly conclude that [Ohio] is [Meritage's] chosen forum." *Hartford Fire Ins. Co. v. Westinghouse Elec. Corp.,* 725 F.Supp. 317, 322 (S.D.Miss.1989) ("Normally in determining the propriety of transfer, a plaintiff's choice of forum is entitled to primary consideration. . . . But where the plaintiff has filed two actions in Minnesota, and another in Georgia and finally elected to file suit in Mississippi, the court can hardly conclude that Mississippi is plaintiff's chosen forum. And, in any event, it has been recognized that a plaintiff's choice of forum is entitled to little weight where he has sued in a district other than the district of his residence."). *See also Gresser v. Wells Fargo Bank,* 2012 WL 1094338, at *2 (N.D.Cal. Mar. 29, 2012) ("[I]f the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration. . . . The degree to which courts defer to the plaintiff's chosen venue is substantially reduced where the plaintiff's venue choice is not its residence or where the forum chosen lacks a significant connection to the activities alleged in the

complaint. . . . [W]hen the plaintiff chooses a forum which has no connection to himself or the subject matter of the suit, and is thus not his 'home turf,' the burden on the defendant is reduced and it is easier for the defendant to show that the balance of convenience favors transfer. If the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, [a] plaintiff's choice is only entitled to minimal consideration.").

### 3. Equitable Remand/Permissive Abstention

 The section of the Judicial Code under which Meritage seeks a remand of the State Court Action provides that an action may be remanded "on any equitable ground." 28 U.S.C. § 1452(b). Permissive abstention, which Meritage also requests, is governed by 28 U.S.C. § 1334(c)(1), which states that:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). Permissive abstention under § 1334(c)(1) is "an extraordinary and narrow exception to the duty of the federal courts to adjudicate controversies which are properly before it." *Bavelis,* 453 B.R. at 881 (internal quotation marks omitted).

 The equitable-remand and permissive-abstention analyses are "essentially identical. . . ." *Parrett v. Bank One, N.A. (In re Nat'l Century Fin. Enters., Inc., Inv. Litig.),* 323 F.Supp.2d 861, 885 (S.D.Ohio 2004) (internal quotation marks

omitted). The factors courts have considered in determining whether to equitably remand a case include (1) duplicative and uneconomical use of judicial resources in two forums, (2) prejudice to the involuntarily removed parties, (3) forum non conveniens, (4) the state court's ability to handle a suit involving questions of state law, (5) comity considerations, (6) lessened possibility of an inconsistent result and (7) the expertise of the court in which the matter was originally pending. *See id.* *See also Mann v. Waste Mgmt. of Ohio, Inc.,* 253 B.R. 211, 214–15 (N.D.Ohio 2000). In considering whether to exercise permissive abstention, courts "consider numerous factors[,]" including: (1) the effect or lack of effect on the efficient administration of the estate if a court abstains, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted core proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on this court's docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, (12) the presence in the proceeding of nondebtor parties and (13) any unusual or other significant factors. *Nat'l Century Fin. Enters., Inc., Inv. Litig.,* 323 F.Supp.2d at 884–85.

On balance, the factors to be considered in making the determination to equitably remand or exercise permissive abstention, at least as things now stand, appear to weight against both. Because it would result in an entirely new court becoming involved in the disputes between Meritage and JPMorgan rather than having the Nevada Federal District Court continue to adjudicate them, abstention and remand would result in the duplicative and uneconomical use of judicial resources. And because the Estate continues to exist, abstention and remand could affect the efficient administration of the Estate. Moreover, there is no reason to believe that a transfer would prejudice Meritage; Meritage has been litigating matters related to Inspirada in the District of Nevada for several years and is currently appealing the Confirmation Order in that district.

The Ohio Federal District Court could deny the Remand Motion outright.[41] An alternative to denying the Remand Motion outright is to deny it without prejudice to its renewal in the Nevada Federal District Court (or the Nevada Bankruptcy Court, if the Nevada Federal District Court refers the matter)[42] after the State Court Action is transferred to the District of Nevada. *See MD Acquisition,* 2009 WL 466383, at *6 (granting motion to transfer a proceeding related to a bankruptcy case to another federal district but denying the motion for remand to the state court without prejudice on the ground that the bankruptcy court presiding over the debtor's bank-

---

**41.** As the Court stated in *Bavelis,* a "split of authority ... exists on the issue of whether the district court to which the lawsuit was removed or the bankruptcy court where the debtor's case is pending should decide the remand issue." *Bavelis,* 453 B.R. at 885.

**42.** According to the parties, unlike in the Southern District of Ohio, the District of Nevada does not have a standing order of reference. *See* Tr. at 13:14–15; 14:16; 52:13–14.

ruptcy case "is in the best position to correctly evaluate [the permissive abstention and equitable remand] factors and determine whether it should exercise its jurisdiction over this action or abstain and return it to the state courts"); *Aztec Indus., Inc. v. Standard Oil Co. (In re Aztec Indus., Inc.)*, 84 B.R. 464, 470 (Bankr. N.D.Ohio 1987) (recommending to the district court that a lawsuit be transferred to another federal district but that the district court leave the motion for remand to be decided in the transferee district); *DVI Fin. Servs. Inc. v. Cardiovascular Labs., Inc.*, 2004 WL 727105, at *3 n. 11 (Bankr. E.D.Pa. Mar. 18, 2004) (after analyzing the issue of equitable remand, holding that the action should be transferred to another federal district, with the equitable-remand determination to ultimately be made in the transferee district, and stating that "[g]iven my review of the briefs and consideration of the oral argument, the above recitation of the stipulated factual record and discussion of the parties' arguments in favor and opposition to equitable remand are intended to assist with that determination"). The Court raised this alternative during the Hearing. *See* Tr. at 46. Counsel to Meritage argued against that approach, *see* Tr. at 46–49, while counsel to JPMorgan, which had suggested the approach in one of its briefs, *see* JPMorgan Reply at 15, argued for it. *See* Tr. at 54.

 Under the circumstances, the best approach appears to deny the Remand Motion without prejudice. First, the party seeking transfer, JPMorgan, itself suggested that the transferee court decide the equitable remand issue, while the party opposing transfer, Meritage, presumably would not be prejudiced by having another bite at the equitable-remand apple. Second, certain of the factors to be considered in the permissive-abstention analysis—in-

cluding the burden on the docket of the court that will be deciding the merits—are best addressed by the court that would actually be hearing the matter if it is not remanded. The Court, therefore, recommends that the Ohio Federal District Court follow the approach taken in *MD Acquisition* and deny the Remand Motion without prejudice to the renewal of the motion in the Nevada Federal District Court.

## V. Conclusion and Notice

For the foregoing reasons, the Court concludes that: (1) the State Court Action was related to the South Edge Bankruptcy Case on the Removal Date and remains related as of the present time; (2) transfer of the State Court Action to the Nevada Federal District Court is in the interest of justice and would serve the interests of convenience; and (3) equitable remand of the State Court Action to the Ohio State Court would not be appropriate. Accordingly, the Court recommends that the Ohio Federal District Court grant the Transfer Motion. The Court also recommends that the Ohio Federal District Court deny the Remand Motion without prejudice to the renewal of the motion in the Nevada Federal District Court.

 Pursuant to Bankruptcy Rule 9033(b), "[w]ithin 14 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk [of the bankruptcy court] written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection." Fed. R. Bankr.P. 9033(b). In addition, "[a] party may respond to another party's objections within 14 days after being served with a copy thereof." *Id.*[43] Failure to file objec-

---

**43.** "The bankruptcy judge may for cause extend the time for filing objections by any party

tions within the specified time may constitute a waiver of the right to appeal an order of the District Court regarding this Court's proposed findings of fact and conclusions of law. *See Nantahala Vill., Inc. v. NCNB Nat'l Bank of Florida (In re Nantahala Vill., Inc.), 976 F.2d 876, 880 (4th Cir.1992).*

The Clerk of the Bankruptcy Court is hereby directed to transmit this opinion, which shall serve as the Court's report and recommendation, to the Clerk of the District Court for the Southern District of Ohio, Eastern Division, for assignment to a District Judge. The Clerk shall defer transmittal of this report and recommendation to the District Court until such time as it has been served upon all parties and the objection period prescribed by Bankruptcy Rule 9033(b), including any extension of that period approved by the Court, has expired.

**IT IS SO ORDERED.**

Exhibit A

Effective Date Implementation of South Edge. LLC Plan of Reorganization

for a period not to exceed 21 days from the expiration of the time otherwise prescribed by this rule." Fed. R. Bankr.P. 9033(b). "A request to extend the time for filing objections must be made before the time for filing objections has expired, except that a request made no more than 21 days after the expiration of the time for filing objections may be granted upon a showing of excusable neglect." *Id.*